**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

> **EXHIBIT**
> **A**

TRIANGLE EXPERIENCE GROUP, INC., :
11182 Hopson Road, Suite A :
Ashland, VA 23005 :
  :
  :
     Plaintiff, :
  :
v. :
  : Case Number _____
MAX MINDS, LLC, :
12400 North Meridian Street, Suite 175 : JURY TRIAL DEMANDED
Carmel, IN 46032 :
  :
     Defendant. :
  :

Serve: Max Minds, LLC
      c/o Brandon Fischer, Registered Agent
      1740 West 161st Street, Westfield, IN 46074

## COMPLAINT

Triangle Experience Group, Inc., ("TEG") by counsel, hereby files its Complaint against Max Minds, LLC for claims arising out of the breach of a joint venture agreement.

### Summary

1.     The parties entered into a Joint Venture Agreement ("Agreement"), as set forth as **Exhibit 1**. Under the Agreement, the parties were to collaborate on creating a new software system, "Haptic," which could be used by both Federal and Commercial entities. Under the Agreement, the parties would co-own the technology created by the collaboration, and the parties would share 50/50, the revenues generated by their collaboration, with some exceptions.

2.     The Defendant breached the Agreement by: 1) creating a defective product for the Federal space that failed catastrophically, 2) failing to update the Haptic Federal version of the software, 3) by using the funding provided by the Plaintiff to update Haptic Federal into a

1

commercial product known as "Alleo," and 4) refusing to share with the Plaintiff the revenues generated by the Defendant's own sales of Haptic, Haptic Federal and/or Alleo, all of which were essentially the same product, with different updates.

3.       The Defendant breached its warranty of implied fitness for a particular purpose because the software failed catastrophically.

### Parties

4.       The Plaintiff TEG is a Virginia stock corporation with its principal place of business in Ashland, Virginia, with the address shown in the caption. TEG specializes in providing services to the federal government.

5.       Max Minds, LLC ("Max Minds" or "Defendant") is an Indiana limited liability company, with a principal place of business in Carmel, Indiana, with the address shown in the caption. Max Minds was created on May 3, 2018. Upon information and belief, Max Minds' sole member is Brandon Fischer ("Fischer") who is domiciled at the address shown in the caption.

### Jurisdiction & Venue

6.       This Court has subject matter jurisdiction pursuant to 28 USC § 1332(a)(1) because this matter involves claims between citizens of different states where the amount in controversy exceeds $75,000.

7.       Venue is proper in this Court pursuant to 28 USC § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.

8.       Max Minds is subject to personal jurisdiction in this Court because it entered into contracts requiring performance in Virginia, caused harm in Virginia, derived substantial revenue from Virginia, breached contracts in Virginia, and regularly conducts business in Virginia.

2

**Facts**

9.      TEG was formed in 2012 as a service disabled veteran owned small business that provides services and support to the United States government pursuant to government contracts.

10.      Since its inception, TEG has successfully provided cutting edge military technology to the United States government through various contract vehicles and has enjoyed fruitful and lasting relationships with several customers within the Department of Defense.

11.      One of TEG's premier services that it provides to the Government customer is an operating system originally known as "C4MAP" – "Comprehensive Collaborative Command & Control Mission Application Platform."

12.      C4MAP is a collection of commercial off the shelf ("COTS") software components which integrates multiple mission command platforms and collaboration tools into one common operational picture ("COP").

13.      C4MAP provides a globally military-hardened, distributed, synchronized, uniform collaborative, highly secure operation center. In essence, C4MAP provides the fusion and interconnection of information on a single screen, which has limitless benefits to the United States and Department of Defense.

14.      C4MAP is also known as "Virtual Joint Operations Center" ("VJOC") capability in the Department of Defense (DoD) and Intelligence Community (IC).

15.      C4MAP, or, VJOC, is a server-based collaborative workspace that uses a browser interface to enable users to collaborate in real time. VJOC has screensharing capabilities that allow users to select the display window of an individual program on their workstation and share it live in real time to the VJOC workspace.

3

16.     The VJOC workspace is an infinite canvas of screen real estate that operates synchronously for all members in real-time.

17.     The benefits of VJOC to the United States Department of Defense are essentially limitless and incredibly valuable.

18.     TEG has enjoyed a long history of providing C4MAP and its capabilities to the Department of Defense.

19.     C4MAP, like any operating system, requires a source code for configuration, installation, operation, integration and deployment to deliver capabilities.

20.     Initially, C4MAP was powered by a source code known as "Synthesis," which was owned by a company known as Prysm.

21.     Fischer was formerly a senior software developer at Prysm.

22.     While a Prysm employee, Fischer attended multiple presentations of C4MAP in Virginia, during which time TEG and its engineers demonstrated C4MAP and its capabilities.

23.     Fischer was impressed and inquired whether there might be an opportunity for him to work with TEG. Specifically, in April 2018, Fischer inquired about forming a partnership regarding C4MAP, with Fischer providing the source code to power the operation system. TEG declined as Fischer was subject to a non-competition agreement with Prysm. By May 2018, Fischer founded Max Minds to provide general software solutions to customers.

24.     In July 2019, after the non-competition period had expired, Fischer contacted TEG again and indicated his desire to partner with TEG. On July 2, 2019, Fischer wrote to TEG stating that he was coming to Washington, DC and would like to meet with TEG. To that end, he further stated:

> For full transparency, my goal is to find a partner who is willing to invest in my
> team and our product and, in return, receive special licensing terms/conditions that

allows them to make 2x return on their investment + a period of exclusivity in the federal space. Would love for you guys to be that partner and I hope we can find a time to get together that week. If you'd like to talk beforehand, just let me know.

25.    At this time, Max Minds did not actually have any software system.

26.    On July 17, 2019, TEG and Max Minds entered into a non-disclosure agreement which is attached as **Exhibit 2** ("NDA Agreement"). Under the NDA agreement, Max Minds promised to keep TEG's information confidential for five years.

27.    After entering into the NDA agreement, TEG brought Fischer/Max Minds to the Federal government's C4MAP Lab in Suffolk, Virginia. TEG then showed Fischer the critical information necessary to operate a virtual collaborative workspace. Fischer explained to TEG that he wanted TEG to hire and/or partner with Max Minds to build and improve TEG's C4MAP's system with new software.

28.    After July 2019, Fischer used the confidential information provided to him by TEG and worked with TEG's employees to create a BETA version of a new software, known as "Haptic."

29.    On October 5, 2019, Fischer emailed TEG and invited TEG to virtually test the new software. After October 5, 2019, Fischer and TEG's staff worked to improve Haptic, as detailed by the chat log of activity, albeit doing so without any agreement other than the non-disclosure agreement.

30.    On November 5, 2019, Fischer met with TEG in Chantilly, Virginia to discuss the new capability moving forward with funding for a new product called Haptic.

31.    As of January 23, 2020, Haptic was a joint work of both Max Minds and TEG, though Max Minds' use of Haptic was limited by the NDA Agreement.

32.     On January 23, 2020, TEG and Max Minds executed the Joint Venture Agreement ("JV Agreement"), identified previously as Exhibit 1.

33.     Pursuant to the JV Agreement, TEG would make a series of payments to Max Minds, and in return, Max Minds would "create and maintain" a branch of the Haptic source code, called "Haptic Federal." So long as TEG hit certain sales goals, then TEG would exclusively provide Haptic Federal to the Federal government.

34.     The parties agreed that Max Minds would provide TEG with software updates no less than once every three months.

35.     While the parties agreed that any intellectual property resulting from future custom software development paid by TEG would be co-owned by TEG and Max Minds, the JV Agreement did not specifically address the ownership of the original Haptic source code.

36.     Nevertheless, the JV Agreement provided that the parties would share all revenues 50/50, when using co-owned intellectual property, with certain exceptions.

37.     The Haptic source code, including all of its branches, are co-owned by TEG and Max Minds.

38.     In May 2020, TEG demonstrated the new C4MAP, powered by Haptic, to the Commanding General of the U.S. Army's XVIII Airborne Corps. The success of this demonstration led to the US Army sponsoring an IATT (Interim Authority To Test) and the first large-scale fielding and testing of C4MAP powered by Haptic (Beta).

39.     From August 2020 through October 2020, the U.S. Army tested the new C4MAP powered by Haptic. This testing resulted in the identification of approximately 250 fixes that were needed to solve various problems.

40.     Despite the large number of problems, the Army viewed C4MAP powered by Haptic as a "game changer," and that led to new challenges.

41.     In October 2020, C4MAP, powered by Haptic, was used by XVIII Airborne Corps for testing and fielding of the new capability. The new capability was recommended by XVIII Airborne Corps by the Joint Special Operations Command, who had previously tested the capability.

42.     In February 2021, TEG invited Fischer to Ft. Hood, Texas so that he could see how the US Army intended to use C4MAP. Fischer stated that he was "humbled and profoundly inspired."

43.     In March 2021, TEG submitted the Haptic to the U.S. government for evaluation. As TEG was able to prove the value of C4MAP across the DOD during the initial IATT, the government had decided to obtain a full ATO (Authority To Operate) on a classified network.

44.     In August 2021, TEG received an email from John McDonald of Next Studios. He did not have an NDA, but he explained that Max Minds has asked him to manage processes.

45.     In October 2021, Fischer informed TEG that he was developing a use case to use with potential investors. Fischer failed to state whether he had provided an NDA to potential investors or had informed them that TEG was Haptic's co-developer.

46.     In November 2021, the US Army purchased the fielded version of C4MAP powered by Haptic to accredit the software. This was the last version that functioned properly. It is known as the 3.1.17 version.

47.     On December 13, 2021, TEG learned, by logging on to c4map.hap.tc, that Max Minds had covertly changed Haptic's name to Alleo. When questioned, Fischer admitted that Alleo was simply a name change.

48.     In a call on December 15, 2021, while TEG had provided substantial funding to fix the problems identified in testing with the federal government, Fischer indicated that he did not want to do any more custom engineering projects for TEG, unless there was a specific well-defined project. He noted that the "ownership of the IP" had muddied the waters. When asked about the name change of Alleo, Fischer's response was that he had given TEG too much access. When Fischer was questioned about the need for a separate branch of Haptic Federal, Fischer responded that that was his intent, "when that time comes." He had not made any such division yet, because it was too expensive.

49.     Whatever Fischer's intention, on April 1, 2022, Max Minds began advertising Alleo to government contractors, instead of Haptic.

50.     For the next year, the parties continued to work together, with TEG reporting occasional critical bugs to Max Minds, including, but not limited to: on April 5, 2022 (Presentation mode), April – September 2022 (Dumpster Blender), November 2022 (Configuration Tool). As a result of these failures, TEG did not make additional sales.

51.     On December 8, 2022, TEG provided Fischer with a document prepared by the U.S. Central Command that outlined the government's concerns and priorities. Max Minds has never responded to this document.

52.     As a result of a test on January 4-5, 2023, another bug was identified in "Live Notepad" that oversaturated the application and customer network with message traffic.

53.     On January 10, 2023, the software failed to work as intended.

54.     On January 15, 2023, the DoD began turning off aspects of the software, like Live Notepad, that were causing problems.

55.     On January 26, 2023, during a dress rehearsal for a full DoD exercise, users were not able to screen share, play video, and take leader control of the platform due to a problem in the Haptic code.

56.     On January 27-31, 2023, it was discovered that since providing the 3.1.17 version Max Minds had reduced the bitrate for video share quality. This was done unilaterally and without informing TEG. Max Minds then delivered a hot fix but said that it hadn't been able to test it.

57.     On February 8, 2023, TEG's system maintenance detected new bugs.

58.     On February 22, 2023, TEG received the newest build from Max Minds (version 3.1.21.4). TEG immediately identified critical failures, such that the product was not useable.

59.     On March 30, 2023, the US government scanned version 3.1.21.3, and identified more than 50 critical errors.

60.     On May 5, 2023, TEG notified Max Minds that it still does not have a product that it can sell. In fact, Max Minds has never provided TEG with a version that it can sell.

61.     Despite paying millions of dollars to Max Minds in engineering services, losing millions of dollars in attempting to repair Max Minds' failed efforts, and losing millions of dollars in sales, TEG discovered that Max Minds was actually releasing monthly updates to its Alleo product but failing to provide any new features and fixes to the Haptic federal product.

62.     Additionally, TEG learned that Max Minds had sold the Alleo software to one or more Federal government customers, even though TEG enjoyed exclusivity in the Federal government space until December 31, 2023.

## COUNT I: DECLARATORY JUDGMENT

63.     The allegations in paragraphs 1 – 62 are re-alleged herein.

9

64.    The software in question is all the same, whether it is called, Haptic, Haptic Federal, Haptic Commercial or Alleo.

65.    TEG respectfully requests that the Court declare the software, and all versions of it, is owned by TEG and Max Minds on a 50/50 basis.

WHEREFORE, TEG respectfully requests that the Court declare that the software, whether it is called Haptic, Haptic Federal, Haptic Commercial or Alleo is the same software that is co-owned by TEG and Max Minds on a 50/50 basis, and to grant TEG the costs of the action.

## COUNT II: BREACH OF CONTRACT

66.    The allegations in paragraphs 1 – 62 are re-alleged herein.

67.    Max Minds breached the JV Agreement by failing to create and maintain a functioning source code.

68.    Max Minds' breach proximately caused TEG to sustain million in losses, in terms of direct and consequential damages.

WHEREFORE, TEG respectfully requests that the Court grant judgment against Max Minds in the amount of $90 million, plus interest and costs.

## COUNT III: BREACH OF WARRANTY

69.    The allegations in paragraphs 1 – 62 are re-alleged herein.

70.    Max Minds breached the implied warranty of fitness for a particular purpose by failing to create and maintain a functioning source code for the purpose of U.S. Military consumers.

71.    Max Minds' breach proximately caused TEG to sustain million in losses, in terms of direct and consequential damages.

10

WHEREFORE, TEG respectfully requests that the Court grant judgment against Max Minds in the amount of $90 million, plus interest and costs.

## COUNT IV: BREACH OF CONTRACT

72.     The allegations in paragraphs 1 – 62 are re-alleged herein.

73.     Max Minds' breached the JV Agreement by making sales of the software and failing to provide TEG with 50 percent of the revenues of such sales.

74.     Max Minds' breach proximately caused TEG to sustain an unknown amount of losses.

WHEREFORE, TEG respectfully requests that the Court grant judgment against Max Minds in the amount of $10 million, plus interest and costs, or such other amount to be proved at trial.

## COUNT V: BREACH OF THE NON-DISCLOSURE AGREEMENT

75.     The allegations in paragraphs 1 – 62 are re-alleged herein.

76.     Max Minds breached the Non-disclosure Agreement by providing TEG's confidential information to third parties, including vendors, investors, and other parties, without TEG's permission.

WHEREFORE, TEG respectfully requests that the Court grant judgment against Max Minds in the amount of $10 million, plus interest and costs, or such other amount to be proved at trial.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in this action for all claims so triable.

Dated: December 28, 2023                Respectfully submitted,

Richard D. Kelley, Esq., VSB No. 44228
Raighne C. Delaney, Esq., VSB No. 38787
Stephen D. Caruso, Esq., VSB No. 87376
Bean, Kinney & Korman, P.C.
2311 Wilson Boulevard, 5th Floor
Arlington, VA 22201
(703) 525-4000
(703) 525-2207 (Fax)
rkelley@beankinney.com
rdelaney@beankinney.com
scaruso@beankinney.com
*Counsel for Triangle Experience Group, Inc.*

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

TRIANGLE EXPERIENCE GROUP, INC.

## DEFENDANTS

MAX MINDS, LLC

**(b)** County of Residence of First Listed Plaintiff    Hanover
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Hamilton, IN
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Bean, Kinney & Korman, P.C.
2311 Wilson Blvd., Suite 500, Arlington, VA 22201
703-525-4000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |      Liability    ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &      Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|      & Enforcement of Judgment |      Slander      Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'      Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |      Liability    ☐ 368 Asbestos Personal | |      New Drug Application | ☐ 470 Racketeer Influenced and |
|      Student Loans | ☐ 340 Marine      Injury Product | | ☐ 840 Trademark |      Corrupt Organizations |
|      (Excludes Veterans) | ☐ 345 Marine Product      Liability | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment |      Liability    **PERSONAL PROPERTY** | **LABOR** | | ☐ 485 Telephone Consumer |
|      of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** |      Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending |      Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract |      Product Liability    ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal      Property Damage |      Relations | ☐ 863 DIWC/DIWW (405(g)) |      Exchange |
| ☐ 196 Franchise |      Injury    ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | ☐ 362 Personal Injury -      Product Liability | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| |      Medical Malpractice |      Leave Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff |      Act |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee |      Income Security Act |      or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 240 Torts to Land | ☐ 443 Housing/      Sentence | |      26 USC 7609 |      Act/Review or Appeal of |
| ☐ 245 Tort Product Liability |      Accommodations    ☐ 530 General | | |      Agency Decision |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of |
| |      Employment    **Other:** | ☐ 462 Naturalization Application | |      State Statutes |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |      Other    ☐ 550 Civil Rights |      Actions | | |
| | ☐ 448 Education    ☐ 555 Prison Condition | | | |
| |    ☐ 560 Civil Detainee - | | | |
| |      Conditions of | | | |
| |      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| | | | | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: 28 USC § 1332(a)(1)

Brief description of cause:
Diversity-Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
90,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
12/28/2023

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT 1

UNCLASSIFIED

# Joint Venture Agreement

## Agreement

Triangle Experience Group ("TEG") and Max Minds, LLC ("MAX") are entering into the following Joint Venture Agreement. The key tenants of the agreement are:

1. TEG will represent the capability, maintain the delivered systems and provide capability attributes statements to the federal customer. TEG will maintain a web presence for marketing material of the Haptic Federal product. TEG will deliver, deploy, sustain and develop customer requirements.
2. MAX will develop and engineer capabilities to support the customer needs. TEG and MAX will partner together to deliver capabilities to the end user in the federal customer space.

The agreement has three main sections:

1. Collective approach to sell, deliver and sustain a collaborative capability to the US Government.
2. Share revenues awarded by US Government customers.
3. Maintain a federally focused source code, called Haptic Federal, for exclusive use by the US government. The exclusivity comes with TEG's ability to sell, market, install, train, maintain the capability. Considering, MAX concentrates on the development and engineering of its platform.

## Retainer

TEG agrees to execute an initial retainer payable to MAX. The retainer and associated payment schedule is commensurate and contingent upon government funds. Retainer payments are credited towards revenue targets below.

1. 1 Feb – 30 Apr 2020: $45k, payable on or before 01 Feb 2020
2. 1 May- 27 July 2020: $75k, payable on or before 01 May 2020
3. 27 July 2020 – 27 July $25k per month, payable on or before the first of each month.

Description of payments:

- Payment #1 is guaranteed currently available funds
- Payment #2 is proposed & contingent upon govt funding of the remaining ceiling on base year contract
- Payment #3 is proposed & contingent upon govt funding the option year associated with current contract
- All $25k per month retainer fees in this section will end and be replaced once the sales revenue payments meet or exceed $300K per year as per section titled "**TEG and MAX revenue share**" of this Joint Venture agreement.

Retainer payments will be used by MAX for the following:

- Create and maintain a branch of the Haptic source code, called Haptic Federal;
- Install and support the 2x installations that TEG has requested for testing and demonstration purposes;
- As the commercial Haptic platform evolves, MAX will provide TEG with a software update at least once every 3 months;

Triangle Experience Group, Inc.
11182 Hobson, Ashland VA 23005
www.triangleexperience.com

- MAX will support TEG, when possible, at any demos/events;
- MAX will collaborate with TEG on marketing/sales collateral.

## Exclusivity of Distribution

TEG is the exclusive distributor/reseller of the Haptic Federal product into the federal market. Below are the license-based revenue targets, paid to MAX, that need to be hit in order to (maintain) the exclusivity beyond the first year.

- $300K in 2020
- $1M in 2021
- $3.75 in 2022
- $5M in 2023
- $10M in 2024
- after year 5, a 50% growth rate year-over-year

## Information Exchange

TEG and Max agrees to establish and share an electronic files system. TEG and MAX agree to work collaboratively on the preparation and delivery of:

- Proposals
- Marketing materials
- Activity reporting to government customers

TEG and MAX agree to conduct routine project and program management review discussions.

## Intellectual Property

Any Intellectual Property ("IP") resulting from custom software development that is paid for by TEG will be co-owned by TEG and MAX, except any plug-in features paid for by the government that are contractual deliverables to the govt customer.

## Demo Product/Licenses

MAX agrees to partition two instances of Haptic Federal, for testing and demo purposes, and provide TEG with the ability to create unlimited user accounts. One instance will be used for testing and development and one will be used for demonstrations. Both instances will be installed in the TEG commercial data center. The data center will be hosted by TEG and access will be given to MAX personnel.

## Source Code

If either TEG or MAX should cease to be a viable company the other company would convert ownership of the source code in an ownership transfer, so long as TEG is still the exclusive reseller/distributor.

## Haptic Federal Pricing

- Target MSRP $500k (minimum $250K, per location) On-Prem C4MAP Secure Gateway Nod (SGN): TEG is responsible for shipping, delivery, functional acceptance, install, training and Tier 1 support.
- Target MSRP year over year renewal: 20% of negotiated sale price above (minimum $50K per year, per location)

UNCLASSIFIED

Triangle Experience Group, Inc.
11182 Hobson, Ashland VA 23005
www.triangleexperience.com

- MAX and/or MAX development partners may develop new products or add-ons that TEG can resell into the federal market. Pricing and margin to be determined.

**TEG and MAX revenue share:**
- 50% on total sale of Haptic Federal product and user license sales in federal customer and opportunity business space
  - Exceptions: Training, A/V installs, additional H/W expenses, accessories
- 50% on total sale in non-federal opportunities, when using co-owned IP
  - Exceptions: Any non-federal sale opportunity exclusive to TEG or MAX

**Channel Sales and Display Partner Relationships**
- TEG will establish and manage all federal channel sales partnerships. Any channel discount will be negotiated using TEG's portion of the TEG/MAX shared revenue.
- TEG recognizes that MAX maintains close relationships with display manufacturers, like Planar, Dell, etc. These display manufacturers will occasionally send sales leads and/or invite MAX to participate with them in events/tradeshows. Any Federal sales opportunities that come to MAX from these events will be handed off to TEG. For these opportunities, TEG agrees to resell displays from the display manufacturer and not specify a competitive product.

**Acquisition of Source Code**
If TEG finds a suitor for the Haptic Federal product, MAX would be willing to sell the Haptic Federal source code. Sale price could be calculated as the greater of $5M -or- 5x gross sales from the previous year. If TEG and MAX both agree on all terms of the sale, the proceeds could be split in the following way:
- 50% split, if sale price is $20M or more.
- 70% MAX, 30% TEG if sale price is less than $20M.

**Drag-Along Rights**
If either MAX or TEG is sold; the terms of this agreement will still be honored by the acquiring company for 36 months.


SIGNATURE PAGE FOLLOWS

Triangle Experience Group, Inc.
11182 Hobson, Ashland VA 23005
www.triangleexperience.com

The Joint Venture Agreement is accepted on this 13th day of January 2020.


Triangle Experience Group ("TEG")                    Max Minds, LLC ("MAX")


By: _____          By: _____


Printed:    Robert Clare                                   Printed:    Brandon Fischer


Title:    CEO/President                                      Title:        CEO/Founder


Date:    23 January 2020                                  Date:    23 January 2020

# EXHIBIT 2

# MUTUAL NONDISCLOSURE  AGREEMENT
## TEG/MAX Minds LLC

THIS AGREEMENT  is made and entered into as of  JULY 17, 2019 by and between Triangle Experience Group, Inc (TEG) a corporation  organized and existing  under the laws of the Commonwealth of Virginia with an office located  at 1 Bowman Drive, Suite 175, Fredericksburg, VA 22408 and Max Minds, LLC (MAX) a corporation organized and existing  under the laws of the State of Indiana having offices at 4142 Pete Dye Blvd, Carmel, IN 46033. "Party" means each party individually; "Parties", "Disclosing Party", or "Receiving Party" means TEG and MAX, or each Party individually as they receive or disclose information.

NOW THEREFORE, in consideration of  the foregoing and of the mutual promises contained herein, the Parties hereto do hereby mutually agree as follows:

1. **Definitions.** Confidential Information means all confidential or proprietary information in oral, written, graphic, electronic or other form including, but not limited to, past, present and future business, financial and commercial information, business concepts, prices and pricing methods, marketing and customer information, financial forecasts and projections, technical data and information, formulae, analyses, trade secrets, ideas, methods, processes, know-how, computer programs, products, equipment, product road maps, prototypes, samples, designs, data sheets, schematics, configurations, specifications, techniques, drawings, and any other data or information delivered by either of the Parties to the other.

2. **Identification of Confidential Information.**  All information which is disclosed by the Disclosing Party to the Receiving Party and which is to be protected hereunder as Confidential Information:

    (a)  shall be limited to Confidential Information disclosed to the Receiving Party during the term of this Agreement;
    (b)  if in writing or other tangible form, shall be identified at the time of delivery by means of a clearly marked permanent stamp or conspicuous label bearing a term such as "Confidential",  "Proprietary", "Competition Sensitive", or equivalent;
    (c)  if disclosed in electronic form on digital media or other storage media, shall be marked with an appropriate legend display when the information  originally runs on a computer system and when the information is printed from its data file; and
    (d)  if disclosed in other than permanent form (for example verbally or visually) shall be: (i) identified as proprietary or confidential prior to disclosure; or (ii) identified as confidential within ten (10) days of the initial disclosure in a written notice summarizing the nature of the disclosure.

    In addition, all information disclosed as a result of Receiving Party's access to Disclosing Party's system(s) shall be protected hereunder as confidential information, regardless of whether that information contains any markings identifying it as such.

3. **Term of Confidentiality.**  The Receiving Party will hold Confidential Information in confidence for a period of five (5) years following its receipt in accordance with this Agreement.

4. **Standard of Care for Protection**

    (a)  The obligation to protect Confidential Information will be satisfied if the Receiving Party utilizes the same controls it employs to avoid disclosure, publication or dissemination of its own Confidential Information of a similar nature, but in any case, not less than reasonable care.

(b)  The Receiving Party will make Confidential Information available only to those of its employees, consultants and contractors having a need to know and solely for the Purpose of this Agreement, provided that the Receiving Party has taken adequate steps to bind an employee and other recipients with respect to the use and protection of the Confidential Information under terms and conditions substantially similar to those herein.

5.  **Points of Contact**.  The designated points of contact with respect to the transmission and control of Confidential Information exchanged hereunder are designated by the respective Parties as follows:

|                |                        |
|----------------|------------------------|
| For MAX:       | Brandon Fischer        |
| Address:       | 4142 Pete Dye Blvd     |
|                | Carmel, IN 46033       |
| e – mail:      | brandon@maxminds.com   |
| Telephone:     | 317-514-5000           |

For: TEG: Janna Clare
Address: 1 Bowman Dr., Suite 175
Fredericksburg, VA
22408
email: jclare@triangleexperience.com
Telephone: 910-489-9521

Each Party may change its designation by written notice to the other.

6.  **Exclusions**.  This Agreement shall not restrict disclosure or use of Confidential Information that is:

(a)  developed by the Receiving Party independently of the Disclosing Party's Confidential Information as demonstrated by tangible evidence;
(b)  rightly in possession of the Receiving Party prior to its disclosure to the Receiving Party under this Agreement;
(c)  obtained without restriction by the Receiving Party from a third party who rightfully provided it;
(d)  publicly available other than through the fault or negligence of the Receiving Party; or
(e)  approved for release by written authorization of the Disclosing Party.

7.  **Mandatory Disclosure.**   In the event the Receiving Party is requested or required by legal process to disclose any of the Confidential Information of the Disclosing Party, the Receiving Party shall give prompt notice so that the Disclosing Party may seek a protective order or other appropriate relief.   In the event that such protective order is not sought or obtained, the Receiving Party shall disclose only that portion of the Confidential Information that its counsel advises that it is legally required to disclose.

8.  **Materials.**  All materials provided by "Parties" under this Agreement remain the property of that Party and shall be returned upon request, together with all copies with a certification signed by Company that all copies thereof have either been or are being returned, or have been destroyed to the best of Company's knowledge

9.  **Property Rights.**  All Confidential Information furnished hereunder shall remain the property of the Disclosing Party and shall be returned or destroyed promptly at Disclosing Party's request together with all copies made thereof by the Receiving Party hereunder.  Confidential Information shall not be disclosed to any third parties except as specified in this Agreement.  Confidential Information may be used and copied only as necessary for the Purpose.   Upon request, the Receiving Party shall send the Disclosing Party a certificate certifying the destruction of Confidential Information.

10.  **No License of Other Rights**.   Neither the execution of this Agreement nor the furnishing of any information hereunder shall be construed as granting, either expressly or by implication, estoppel or otherwise, any license or other rights under any invention, copyright, patent, trademark or other intellectual property, now or hereafter, owned or controlled by the Disclosing Party.  Each Party warrants that it has the right to provide Confidential Information for the Purpose.

10. **Remedies**. The Parties acknowledge that their respective Confidential Information is valuable and unique and that disclosure in breach of this Agreement will result in irreparable injury to the Disclosing Party. Therefore, in the event of a breach or threatened breach of the terms of this Agreement, the Disclosing Party shall be entitled to an injunction prohibiting any such breach in addition to and not in lieu of any other rights and remedies including monetary damages.

11. **Export Requirements**. The Parties agree to comply with all applicable export laws, rules and regulations of the United States Government, including without limitation, the International Traffic in Arms Regulations of the U.S. Department of State and the Export Control Act of the U.S. Department of Commerce, in connection with the disclosure, use, and export of any Confidential Information disclosed hereunder. Each Party agrees to provide such information as the other Party shall reasonably consider necessary to verify compliance with this provision. If the Receiving Party of export-restricted information improperly discloses such information, the Receiving Party shall indemnify and hold harmless the Disclosing Party from all resulting claims. The foregoing indemnity is conditioned upon: (1) the Disclosing Party providing the Receiving Party with prompt notice of any applicable claim; and (2) the Receiving Party being given sole control over the defense and settlement of the claim

12. **Publicity**. A Party shall not in any way or in any form disclose, publicize, or advertise in any manner the discussions, transactions or subject matter arising out of or relating to this Agreement without the prior written consent of all other Parties.

13. **Governing Law**. This Agreement shall be governed by the laws of the Commonwealth of Virginia, USA, without regard to its conflicts of laws rules. The International Sale of Goods Convention shall not apply to this Agreement.

14. **Term of Agreement**. The term of this Agreement shall be two (2) years from the date first written above, unless earlier terminated by either Party upon providing thirty (30) days prior written notice. However, the expiration of this Agreement shall not relieve the Parties of their obligations hereunder regarding the protection and use of Confidential Information during the period set forth in Paragraph 3 hereof.

15. **Scope.** This Agreement, along with the exchange of Confidential Information pursuant to this Agreement, shall not give rise to any commitment or obligation for the Parties to enter into any business relationship. Any commitments, obligations, or intentions beyond the protection of Confidential Information shall be addressed in a definitive agreement. No warranties or representations are given for the Confidential Information. The Receiving Party relies on Confidential Information at its own risk. Until a definitive agreement is signed following a more developed relationship, Confidential Information is provided for discussion purposes and only for the Purpose of this Agreement.

16. **General**. This is the entire Agreement between the Parties concerning the exchange of Confidential Information and it supersedes any prior or contemporaneous written or oral agreements thereon and may not be amended or modified except by subsequent agreement in writing by duly authorized officers or representatives of the Parties. Nothing herein is intended to or shall create any agency, joint venture or partnership between the Parties. No failure or delay, in whole or in part, by a Party in exercising any right, power or remedy operates as a waiver thereof. This Agreement is personal to the Parties and non-assignable without the prior written consent of all other Parties. This Agreement shall be binding upon and inure to the benefit of any successor in interest to a Party.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their authorized representatives:

**Max Minds, LLC**

Agreed:

Max Minds, LLC _____

By:

Name: Brandon Fischer

Title CEO

Date: July 17, 2019

**Triangle Experience Group, Inc**

Agreed:

Triangle Experience Group, Inc _____

By:

Name: Janna Clare

Title CFO

Date:

\* Each of the Parties intends that the printing of its signature printed by a receiving printer or fax machine to constitute an original signature, or to have the equivalent evidentiary value of the original signature.