**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*AGENT\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

EXHIBIT
C

6604055
GREGORY & APPEL, INC.
1402 N CAPITOL AVE STE 400
INDIANAPOLIS IN 46202

6604055
GREGORY & APPEL, INC.
1402 N CAPITOL AVE STE 400
INDIANAPOLIS IN 46202

6604055
GREGORY & APPEL, INC.
1402 N CAPITOL AVE STE 400
INDIANAPOLIS IN 46202

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*AGENT\*\*\*\*\*\*\*\*\*\*\***

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*INSURED\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

MAX MINDS

4142 PETE DYE BLVD,
CARMEL 46033-8175

MAX MINDS

4142 PETE DYE BLVD,
CARMEL 46033-8175

MAX MINDS

4142 PETE DYE BLVD,
CARMEL 46033-8175

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*INSURED\*\*\*\*\*\*\*\*\*\*\*\***



# DECLARATIONS
## TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE POLICY
## SHARED AGGREGATE LIMIT

*THIS IS A CLAIMS-MADE POLICY.*
*PLEASE READ THE POLICY CAREFULLY.*

---

**CLAIMS-MADE  NOTICE**

THIS POLICY PROVIDES COVERAGE  ON A CLAIMS-MADE  BASIS. SUBJECT  TO ITS TERMS, THIS POLICY APPLIES ONLY TO "CLAIMS" FIRST MADE AGAINST "YOU" DURING THE "POLICY PERIOD", AUTOMATIC EXTENDED REPORTING PERIOD OR ANY PURCHASED OPTIONAL EXTENDED REPORTING PERIOD THAT MAY APPLY. PLEASE READ THE POLICY CAREFULLY  TO DETERMINE RIGHTS, DUTIES, COVERAGE AND COVERAGE RESTRICTIONS.

---

**"CLAIM EXPENSE"  WITHIN LIMITS NOTICE**

THIS CLAIMS-MADE  POLICY PROVIDES FOR "CLAIM EXPENSE" PAYABLE WITHIN, AND NOT IN ADDITION TO, THE LIMITS OF INSURANCE.  "CLAIM EXPENSE"  WILL REDUCE  AND MAY EXHAUST  THE LIMIT OF INSURANCE,  AND WILL BE APPLIED AGAINST THE RETENTION. IN THE EVENT THAT THE LIMIT OF INSURANCE  IS EXHAUSTED, WE SHALL NOT BE LIABLE FOR "CLAIM EXPENSE", JUDGMENTS OR SETTLEMENTS  IN EXCESS OF THE APPLICABLE LIMIT.

---

| Named Insured and Address: | MAX MINDS<br>4142 PETE DYE BLVD<br>CARMEL, IN 46033-8175 |
|---|---|
| Legal Entity: | Limited Liability Company |

---

| Policy Number:<br>LHW J268705  00 | Policy Period<br>**From: 01/01/2023  To: 01/01/2024**<br>12:01 A.M. Standard Time at the address of the **First Named Insured** as stated herein | Agent Name, Address  and Code:<br>GREGORY & APPEL, INC.<br>1402 N CAPITOL  AVE STE 400<br>INDIANAPOLIS,  IN 46202<br>6604055 |
|---|---|---|
| **Underwriting Company:** | The Hanover Insurance Company | |
| **Address:**  **440 Lincoln Street**<br>Worcester, MA 01653 | | |

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE TO PROVIDE THE INSURANCE  AS STATED IN THIS POLICY.

---

**Item 1: Notice of a Claim**

**Report any Claim or potential Claim to the Company's Dedicated Technology Claim Contact  as required by SECTION V – CONDITIONS**

| | |
|---|---|
| **E-mail:** | TechClm@hanover.com |
| **Phone:** | 888-357-9186 |
| **Fax:** | 508-926-4633 |

---



# DECLARATIONS
# TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE POLICY
# SHARED AGGREGATE LIMIT

THE "FIRST NAMED INSURED" MUST SELECT FROM ONE OR MORE OF THE COVERAGES DESCRIBED BELOW UNDER ITEMS **4.** and **8.** ONLY THOSE COVERAGES SELECTED WITH AN "X" ARE INCLUDED IN THIS POLICY. HOWEVER, IF ANY SPECIFIED COVERAGE IS NOT SELECTED WITH AN "X" BELOW, SUCH COVERAGE AND ANY OTHER REFERENCE THERETO IS DEEMED NOT INCLUDED IN THIS POLICY.

| **Item 2: Named Insured and Address:** | MAX MINDS<br><br>4142 PETE DYE BLVD<br>CARMEL, IN 46033-8175 |
|---|---|
| **Legal Entity:** | Limited Liability Company |

| **Item 3: POLICY AGGREGATE LIMIT** | $1,000,000 |
|---|---|

| **Item 4: Technology Liability Coverage** | **Item 5: Each "Claim" Limit of Insurance** | **Item 6: Each "Claim" Retention** | **Item 7: Retroactive Date** |
|---|---|---|---|
| ☒ Errors and Omissions Liability | $1,000,000 | $5,000 | 01/01/2023 |
| ☒ Cyber and Privacy Security Liability | $1,000,000 | | 01/01/2023 |
| ☒ Personal Injury Liability | $1,000,000 | | 01/01/2023 |
| ☒ Media and Content Liability | $1,000,000 | | 01/01/2023 |
| ☒ Fines & Penalties and Regulatory Defense | $25,000 | | |

| **Item 8: FIRST PARTY CYBER COVERAGE** | **Item 9: Limit of Insurance** | **Item 10: Retention** |
|---|---|---|
| ☒ Security Breach Notification and Remediation | $100,000 | $5,000 |
| ☒ Data and Systems Restoration | $100,000 | $5,000 |
| ☒ Cyber Extortion | $100,000 | $5,000 |
| ☒ Business Income Loss and Extra Expense | $100,000 | 12hours Waiting Period |
| ☒ Contingent Business Income Loss and Extra Expense | $100,000 | 12hours Waiting Period |
| ☒ Funds Transfer Fraud | $100,000 | $5,000 |
| ☒ Computer Fraud | $100,000 | $5,000 |
| ☒ Telecommunications Fraud | $25,000 | $5,000 |
| ☒ Public Relations | $50,000 | $5,000 |
| ☒ Cyber Breach or Extortion Reward | $100,000 | $5,000 |



## DECLARATIONS CONTINUED
## TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE POLICY
## SHARED AGGREGATE LIMIT

| Item 11:    Hanover Technology Professional and Cyber Advantage Policy Premium: | |
|---|---|
| Annual Premium: | $3,292.00 |

| Item 12:    Taxes and Surcharges | |
|---|---|
| Total Taxes & Surcharges Premium | N/A |

| Item 13:    Billing |
|---|
| Billing Type:<br>Direct Bill |
| Payment Plan: |
| Monthly |

| Item 14: | This policy is comprised of the following forms, endorsements and notices: | |
|---|---|---|
| 912-5001 | 10/19 | Declarations Technology Professional And Cyber Advantage  Policy Shared Aggregate Limit |
| 912-5208 | 10/19 | Important Policyholder Information Technology Professional And Cyber Advantage Risk Management Resources |
| 912-5209 | 10/19 | Premium Summary Page - Technology Professional and Cyber Advantage |
| 401-1374 | 12/20 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| 912-5000 | 10/19 | Technology Professional And Cyber Advantage Coverage Part |
| 912-5307 | 10/19 | Cap On Losses From Certified Acts of Terrorism - Technology Professional and Cyber Advantage |
| 912-5309 | 10/19 | Exclusion of Punitive Damages Related To A Certified Act Of Terrorism - Technology Professional and Cyber Advantage |
| 912-6013 | 06/22 | Indiana Changes - Technology Professional And Cyber Advantage |
| SIG-1100 | 11/17 | Signature Page |

# IMPORTANT POLICYHOLDER INFORMATION TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE RISK MANAGEMENT RESOURCES

We are pleased to provide our policyholders with access to the eRisk Hub®, powered by NetDiligence®. The eRisk Hub is a private web-based portal containing information and technical resources that can assist you in the prevention of network, cyber and privacy breaches and support you in the timely reporting and recovery of losses if an incident occurs.

The eRisk Hub features news, content and services from leading practitioners in risk management, computer forensics, forensic accounting, crisis communications, legal counsel, and other highly-specialized segments of cyber risk.

Please note the following:

1. The eRisk Hub portal is a private site for policyholders of insurers within The Hanover Insurance Group. Inc. ("The Hanover") only. Please do not share portal access instructions with anyone outside your organization. You are responsible for maintaining the confidentiality of the Access Code provided to you.

2. Up to three individuals from your organization may register and use the portal. Ideal candidates include your company's Risk Manager, Compliance Manager, Privacy Officer, IT Operations Manager or Legal Counsel.

3. This portal contains a directory of experienced providers of cyber risk management and breach recovery services. The Hanover does not endorse these companies or their respective services. Before you engage any of these companies, we urge you to conduct your own due diligence to ensure the companies and their services meet your needs. Unless otherwise indicated or approved, payment for services provided by these companies is your responsibility.

4. Should you experience a data breach event, you may choose to call the Breach Coach® listed in the portal for immediate triage assistance. Depending on the fee schedule, your initial consultation with the Breach Coach® may be free of charge. Please be aware that the Breach Coach service is provided by a third-party law firm that is not part of The Hanover. Therefore, contacting the Breach Coach does NOT satisfy the claim notification requirements of your policy. You are still obligated to provide notice of a claim pursuant to the terms and conditions of your Hanover policy.

To register for eRisk Hub:

1. Go to https://www.eriskhub.com/hanover.php.

2. Please read the important notice prior to completing the **New User Registration** form in the center of the webpage. Create your own User ID and password. Enter **14014** in the **Access Code** field.

3. Once you've completed registration, you can login immediately by entering the User ID and password you just created in the **Member Login** box in the top right corner of the screen.

*Please note that the independent risk management services offered by eRisk Hub® powered by NetDiligence® are accessible to you as a Policyholder of The Hanover Insurance Company or one of its subsidiaries and affiliates. The Hanover is independent from NetDiligence® and the providers listed on eRisk Hub®. Depending on the terms, conditions, and exclusions of your Hanover policy, The Hanover may not be responsible for any fees or charges you may incur for services or products which may be offered to you by NetDiligence®, eRisk Hub®, or for which you may contract with any provider listed in eRisk Hub®. Under no circumstances should the recommendations, services or products of eRisk Hub® or of providers listed on eRisk Hub® be construed as recommendations, services or products of The Hanover Insurance Group, Inc. or be construed as establishing the existence or availability of any insurance coverage with The Hanover. By making this service accessible to you, The Hanover does not assume (and specifically disclaims) any duty, undertaking or responsibility to you regarding any breach event response advice and risk management services provided through eRisk Hub® and NetDiligence®.*

# PREMIUM SUMMARY PAGE – TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE

| Policy Number: LHW J268705 00 | | |
|---|---|---|
| **Policy Period:** | **From: 01/01/2023** | **To: 01/01/2024** |
| 12:01 A.M. Standard Time at the address of the **First Named Insured** as stated herein | | |

| COVERAGE | PREMIUM |
|---|---|
| Technology Liability Coverage | |
| Total Premium | $2,775 |
| | |
| First Party Cyber Coverage | |
| Total Premium | $452 |
| | |
| Terrorism Premium | $65 |
| | |
| Taxes and Surcharges | |
| | |
| TOTAL POLICY PREMIUM | $3,292.00 |

THIS NOTICE IS PROVIDED IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS NOTICE DOES NOT GRANT COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF COVERAGE UNDER THE POLICY. IF THERE IS A CONFLICT BETWEEN THIS NOTICE AND THE POLICY, THE PROVISIONS OF THE POLICY SHALL APPLY.

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| DISCLOSURE OF PREMIUM: | |
|---|---|
| Total Terrorism Premium | $65 |
| Fire Following Premium | NA |
| Other than Fire Following Premium | $65 |

## Disclosure of Terrorism Coverage Available

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from "acts of terrorism" defined in Section 102(1) of the Act as follows:

> Any act or acts that are certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The premium charged for this coverage is provided in the **SCHEDULE** above and does not include any charges for the portion of loss that may be covered by the Federal Government as described below. This premium has been added to your policy and unless this form is signed and returned to us to reject terrorism coverage, coverage for Certified Acts of Terrorism is provided by your policy.

Your policy may contain other exclusions which could affect your coverage, such as an exclusion for Nuclear Events or Pollution. **Please read your policy carefully**.

### Note for Commercial Property or Commercial Inland Marine Policyholders in Standard Fire States:

In Standard Fire states, terrorism exclusions make an exception for (and therefore provide coverage for) fire losses resulting from an act of terrorism. Any policyholder with a location that we insure in a Standard Fire State that rejects our offer of terrorism coverage in this form will still have coverage with us for fire losses resulting from an act of terrorism.

### Explanation of Premium

If a dollar amount is shown for Fire Following Premium in the **SCHEDULE** above that means we insure a location of yours in a Standard Fire State. Fire Following Premium is shown in the **SCHEDULE** above regardless of whether a policyholder with a location that we insure in a Standard Fire State accepts or rejects terrorism coverage with us. Fire Following Premium represents the charge for the coverage we provide for fire losses resulting from acts of terrorism. Fire Following Premium does not include Other Than Fire Following Premium. All Other Than Fire Following Premium is shown in the Other Than Fire Following Premium field in the **SCHEDULE** above.

If a dollar amount is shown for Other Than Fire Following Premium in the **SCHEDULE** above that means you have accepted terrorism coverage with us. Other Than Fire Following Premium represents the charge for terrorism coverage. Other Than Fire Following Premium does not include Fire Following Premium. If applicable, all Fire Following Premium is shown in the Fire Following Premium field in the **SCHEDULE** above.

The dollar amount shown for Total Terrorism Premium in the **SCHEDULE** above represents the sum of premium for Fire Following Premium and Other Than Fire Following Premium.

**Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**Cap on Insurer Participation in Payment of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Rejection of Terrorism Insurance Coverage***

I decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism.

_____                        _____
Applicant/Policyholder Signature                        Insurance Company

_____                        _____
Print Name                                              Quote or Policy Number

_____
Date

*If this policy is a renewal and:

a.  You have previously submitted a signed Rejection, you are not required to submit an additional Rejection at this time; or
b.  You have previously accepted coverage and now wish to reject, you are required to complete and sign the Rejection of Terrorism Insurance Coverage above.

# TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE

## TABLE OF REFERENCE

Page

**SECTION I – COVERAGE** — **2**

  **A. TECHNOLOGY LIABILITY COVERAGE** — **2**

    **1.** ERRORS AND OMISSIONS LIABILITY — **2**

    **2.** CYBER AND PRIVACY SECURITY LIABILITY — **2**

    **3.** PERSONAL INJURY LIABILITY — **2**

    **4.** MEDIA AND CONTENT LIABILITY — **2**

    **5.** WHEN THIS INSURANCE APPLIES — **3**

    **6.** DEFENSE AND SETTLEMENT — **3**

  **B. FIRST PARTY CYBER COVERAGE** — **4**

    **1.** SECURITY BREACH NOTIFICATION AND REMEDIATION — **4**

    **2.** DATA AND SYSTEMS RESTORATION — **4**

    **3.** CYBER EXTORTION — **4**

    **4.** BUSINESS INCOME LOSS AND EXTRA EXPENSE — **4**

    **5.** CONTINGENT BUSINESS INCOME LOSS AND EXTRA EXPENSE — **4**

    **6.** FUNDS TRANSFER FRAUD — **4**

    **7.** COMPUTER FRAUD — **4**

    **8.** TELECOMMUNICATIONS FRAUD — **5**

    **9.** PUBLIC RELATIONS — **5**

    **10.** CYBER BREACH OR EXTORTION REWARD — **5**

**SECTION II – EXCLUSIONS** — **5**

  **A. EXCLUSIONS APPLICABLE TO BOTH SECTION I – COVERAGE, A. TECHNOLOGY LIABILITY COVERAGE AND B. FIRST PARTY CYBER COVERAGE** — **5**

  **B. EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE, A. TECHNOLOGY LIABILITY COVERAGE ONLY** — **6**

  **C. EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE, B. FIRST PARTY CYBER COVERAGE ONLY** — **8**

  **D. EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE, B. FIRST PARTY CYBER COVERAGE, 2. DATA AND SYSTEMS RESTORATION, 4. BUSINESS INCOME LOSS AND EXTRA EXPENSE, AND 5. CONTINGENT BUSINESS INCOME LOSS AND EXTRA EXPENSE ONLY** — **9**

  **E. EXCLUSIONS APPLICABLE TO FIRST PARTY CYBER COVERAGE, 6. FUNDS TRANSFER FRAUD AND 7. COMPUTER FRAUD** — **9**

**SECTION III – SUPPLEMENTARY PAYMENTS** — **9**

**SECTION IV – LIMITS OF INSURANCE AND RETENTIONS** — **10**

**SECTION V – CONDITIONS** — **11**

**SECTION VI – DEFINITIONS** — **18**

**SECTION VII – EXTENDED REPORTING PERIODS** — **29**

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE

---

**CLAIMS-MADE WARNING**

THIS POLICY PROVIDES COVERAGE ON A CLAIMS-MADE BASIS FOR TECHNOLOGY LIABILITY COVERAGE. SUBJECT TO ITS TERMS, TECHNOLOGY LIABILITY COVERAGE APPLIES ONLY TO "CLAIMS" FIRST MADE AGAINST "YOU" DURING THE "POLICY PERIOD", AUTOMATIC EXTENDED REPORTING PERIOD OR ANY PURCHASED OPTIONAL EXTENDED REPORTING PERIOD THAT MAY APPLY. PLEASE READ THE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, COVERAGE AND COVERAGE RESTRICTIONS.

---

**"CLAIM EXPENSE" WITHIN LIMITS**

THE LIMITS OF INSURANCE FOR TECHNOLOGY LIABILITY COVERAGE WILL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF COVERED "CLAIM EXPENSE". IN THE EVENT THAT THE LIMIT OF INSURANCE IS EXHAUSTED, WE SHALL NOT BE LIABLE FOR "CLAIM EXPENSE", JUDGMENTS OR SETTLEMENTS IN EXCESS OF THE APPLICABLE LIMIT.

---

**RETENTIONS**

THIS POLICY IS SUBJECT TO RETENTION AMOUNTS STATED IN THE DECLARATIONS. AMOUNTS INCURRED FOR COVERED "CLAIM EXPENSE", "DAMAGES", AND "FIRST PARTY CYBER LOSS" SHALL BE APPLIED AGAINST THE APPLICABLE RETENTION AMOUNT. COVERED "CLAIM EXPENSE", "DAMAGES", AND "FIRST PARTY CYBER LOSS" WITHIN THE APPLICABLE RETENTION MUST BE PAID BY THE "FIRST NAMED INSURED" AND SUCH PAYMENTS WILL NOT REDUCE THE LIMIT OF INSURANCE.

---

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "we", "us" and "our" refer to the company providing this policy. Other words and phrases that appear in quotations have special meaning. Refer to **SECTION VI – DEFINITIONS**.

**THE DECLARATIONS WILL IDENTIFY WHICH COVERAGES ARE PROVIDED WITH THIS POLICY. ONLY THOSE COVERAGES SHOWN WITH A LIMIT OF INSURANCE ON THE DECLARATIONS APPLY**.

**SECTION I – COVERAGE**

**A.  TECHNOLOGY LIABILITY COVERAGE**

    **1.  ERRORS AND OMISSIONS LIABILITY**

        We will pay those sums "you" become legally obligated to pay as "damages" and "claim expense" because of a "claim" made against "you" directly resulting from an actual or alleged "errors and omissions anomaly" in "your product" or "your work" to which this insurance applies.

    **2.  CYBER AND PRIVACY SECURITY LIABILITY**

        We will pay those sums "you" become legally obligated to pay as "damages" and "claim expense" because of a "claim" made against "you" directly resulting from an actual or alleged "cyber and privacy security anomaly" in "your product" or "your work" to which this insurance applies.

    **3.  PERSONAL INJURY LIABILITY**

        We will pay those sums "you" become legally obligated to pay as "damages" and "claim expense" because of a "claim" made against "you" directly resulting from an actual or alleged "personal injury anomaly" in "your product" or "your work" to which this insurance applies.

    **4.  MEDIA AND CONTENT LIABILITY**

        We will pay those sums "you" become legally obligated to pay as "damages" and "claim expense" because of a "claim" made against "you" directly resulting from an actual or alleged "media and content anomaly" in "your product" or "your work" to which this insurance applies.

 Copyright 2019 The Hanover Insurance Company. All Rights Reserved. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

5.  **WHEN THIS INSURANCE APPLIES**

The insurance provided in paragraphs **1.** through **4.** above applies only if:

a.  The "third party anomaly" first occurred on or after the applicable retroactive date(s) and before the end of the "policy period". The applicable retroactive date is the specific date entered on the Declarations for that "third party anomaly", or if no date is entered, the policy effective date shown on the Declarations;

b.  The "claim" is first made against "you" during the "policy period" or any applicable extended reporting period we provide and the "claim" is reported to us as set forth in **SECTION V – CONDITIONS, 9. Duties in the Event of a "Claim"**. A "claim" will be deemed to be first made at the following times:

  (1)  With respect to the "Named Insured", when we or any "described authorized person" first receives notice that a "claim" has been made or will be made against the "Named Insured"; or

  (2)  With respect to "you" (other than the "Named Insured"), when either we or "you" first receive notice that a "claim" has been made or will be made against "you";

c.  If two or more "claims" are made on account of a single "third party anomaly" or a series of "related third party anomalies", then they shall be treated as a single "claim" first made on the date the earliest of the "claims" was made, regardless of whether that date is before or during the "policy period" or, if applicable, during an extended reporting period.

d.  "You" did not give notice of such "third party anomaly" to any prior insurer, or notice under any policy of which this policy is a renewal or replacement, or succeeds in time; and

e.  Prior to the inception date of the first Technology Professional and Cyber Advantage policy issued by us, no "described authorized person" knew a "third party anomaly" occurred, or knew of any fact which could reasonably be expected to result in a "claim".

6.  **DEFENSE AND SETTLEMENT**

Only with respect to the insurance provided in paragraphs **1.** through **4.** above:

a.  We have the right and duty to defend "you" against any "claim" seeking "damages" to which this insurance applies, even if the allegations in such "claim" are groundless, false or fraudulent;

b.  We have the right and duty to defend "you" against any "claim" seeking injunctive relief to prevent any "third party anomaly" to which this insurance applies from continuing or resuming, but only if no provider of other insurance has a duty to defend that "claim".

c.  The amount we will pay for "damages" and "claim expense" is subject to limits and retention as described in **SECTION IV – LIMITS OF INSURANCE AND RETENTIONS** and the Declarations. No other obligation or liability to pay sums is covered unless explicitly provided for under **SECTION III – SUPPLEMENTARY PAYMENTS**.

d.  If we retain counsel to defend "you" in a "claim", we will work with "you" to select counsel that is acceptable to both "you" and us, but we retain the sole right to appoint such counsel, subject to applicable law.

e.  When we defend a "claim" against "you", we will pay reasonable and necessary "claim expense" subject to the Limit of Insurance. Payment of such "claim expense" will reduce and may exhaust the Limit of Insurance available to pay "damages".

f.  We have no duty to defend "you" against any "claim" or pay related "claim expense" for a "claim" to which this insurance does not apply.

g.  Our right and duty to defend end when the applicable Limit of Insurance shown on the Declarations has been exhausted by the payment of "damages" or "claim expense". Upon exhaustion of the limits of insurance, we will initiate and cooperate in the transfer of control of the defense of any ongoing "claim" to "you". "You" agree to accept this tender and arrange for the defense of such "claim" as soon as practicable. We agree to take such steps we deem necessary to avoid a default in, or to continue the defense of, any "suit" until the transfer is completed, provided "you" are cooperating with the completion of the transfer.

h.  With respect to all "claims":

  (1)  We may make any investigation of a "claim" we deem necessary;

  (2)  We may settle any "claim" provided we have the "Named Insured's" written consent, which shall not be unreasonably withheld; and

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(3)** "You" will not settle any "claim" without our prior written consent, even if the "claim" is less than the retention amount.

## B. FIRST PARTY CYBER COVERAGE

### 1. SECURITY BREACH NOTIFICATION AND REMEDIATION

We will pay "your" "cyber breach expense" to which this insurance applies directly resulting from an actual or reasonably suspected "information security breach" that:

**a.** Directly results from an actual or alleged "cyber and privacy security anomaly" committed on or after the Cyber and Privacy Security Liability retroactive date shown on the Declarations and before the end of the "policy period"; and

**b.** A "described authorized person" first discovers during the "policy period" and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

### 2. DATA AND SYSTEMS RESTORATION

We will pay "your" "data and systems restoration expense" directly resulting from a "malicious attack" that:

**a.** First occurs during the "policy period"; and

**b.** A "described authorized person" first discovers during the "policy period and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

### 3. CYBER EXTORTION

We will pay "your" "cyber extortion expense" directly resulting from a "cyber extortion threat" that:

**a.** First occurs during the "policy period"; and

**b.** A "described authorized person" first discovers during the "policy period" and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

### 4. BUSINESS INCOME LOSS AND EXTRA EXPENSE

We will pay "your" "business income loss" and "extra expense" incurred during the "business income period of restoration" and directly resulting from:

**a.** A denial of service attack or distributed denial of service attack on "your" "computer system"; or

**b.** A "malicious attack";

that first occurs during the "policy period" and a "described authorized person" first discovers during the "policy period" and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

### 5. CONTINGENT BUSINESS INCOME LOSS AND EXTRA EXPENSE

We will pay "your" "contingent business income loss" and "extra expense" incurred during the "contingent business income period of restoration" and directly resulting from:

**a.** A denial of service attack, or distributed denial of service on a "shared computer system"; or

**b.** A "malicious dependent attack",

that first occurs during the "policy period" and a "described authorized person" first discovers during the "policy period" and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

### 6. FUNDS TRANSFER FRAUD

We will pay "your" loss of "money" or "securities" directly resulting from a "funds transfer fraud" that:

**a.** First occurs during the "policy period"; and

**b.** A "described authorized person" first discovers during the "policy period" and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

### 7. COMPUTER FRAUD

We will pay "your" "computer fraud expense" directly resulting from "computer fraud" that**:**

**a.** First occurs during the "policy period"; and

**b.** A "described authorized person" first discovers during the "policy period" and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

8. **TELECOMMUNICATIONS FRAUD**

We will pay "your" "telecommunications fraud expense" that directly results from a "telecommunications fraud" that:

a. First occurs during the "policy period"; and

b. A "described authorized person" first discovers during the "policy period" and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

9. **PUBLIC RELATIONS**

We will pay "your" "public relations service expense" that:

a. Directly resulting from an actual or alleged "third party anomaly" committed on or after the applicable retroactive date shown on the Declarations and before the end of the "policy period"; but only if

b. The "third party anomaly" is first discovered by the "described authorized person" during the "policy period" and first reported to us during the "policy period" or within 90 days after the end of the "policy period".

10. **CYBER BREACH OR EXTORTION REWARD**

We will pay "your" "cyber breach or extortion reward expense" directly resulting from an "information security breach" or "cyber extortion threat" that:

a. First occurs during the "policy period"; and

b. A "described authorized person" first discovers during the "policy period" and first reports to us during the "policy period" or within 90 days after the end of the "policy period".

## SECTION II – EXCLUSIONS

A. **EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE**, A. TECHNOLOGY LIABILITY COVERAGE AND B. FIRST PARTY CYBER COVERAGE

This insurance does not apply to:

1. **Bodily Injury**

"Bodily injury". However, with respect to:

a. **SECTION VI – DEFINITIONS**, **15. "Cyber and privacy security anomaly"**;

b. **SECTION VI – DEFINITIONS**, **38. "Media and content anomaly";** and

c. **SECTION VI – DEFINITIONS**, **44. "Personal injury anomaly"**, paragraph **c.**

this exclusion does not apply to mental anguish or mental injury.

2. **Cross-insured "Claims"**

Any "claim" against "you" that is brought by or on behalf of any of "you". However, this exclusion does not apply to:

a. A "claim" made by "your" "employee" against "you" for failure to prevent unauthorized access to, or use of, "data" containing "personal information" of such "employee"; however, for purposes of this exception, "you" does not include those individuals or entities identified in paragraphs **e.** or **f.** of the definition of "you"; and

b. A "claim" brought by any of "you" described in **SECTION VI – DEFINITIONS**, **66. "You"**, paragraph **f.** when brought in "your" capacity as a client seeking "damages" resulting from a "third party anomaly" in "your product" or "your work" to which this insurance would otherwise apply.

3. **Employee Benefit Plans**

Any liability or expense arising out of the administration of, or any breach of a fiduciary duty, responsibility, or obligation, or the performance of or failure to perform any act or obligation related to any actual or proposed employee benefit or pension plan, stock option, subscription or ownership plan, or compensation plan, including but not limited to violations of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any similar local, state, federal or foreign law or regulations.

4. **Intellectual Property**

Any liability or expense arising out of theft, misappropriation, misuse, infringement or contributory infringement of any intellectual property right.

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

However, this exclusion does not apply to coverage specifically provided under **SECTION I – COVERAGES**, **A. TECHNOLOGY LIABILITY COVERAGE**, **4. MEDIA AND CONTENT LIABILITY**.

**5. Internet Service Interruption**

Any liability or expense arising out of an Internet service interruption or failure. However, this exclusion does not apply if such interruption or failure was caused by a "third party anomaly" in "your product" or "your work" or a "first party incident".

**6. Criminal, Fraudulent, Dishonest Act or Intentional Violation of Law**

Any liability or expense arising out of a criminal, fraudulent or dishonest act, error or omission or intentional or knowing violation of a law, committed by "you" or with "your" consent or knowledge, alone or in collusion with others.

However, this exclusion does not apply to:

**a.** "You" if "you" did not participate in, knowingly allow or direct such criminal, fraudulent, dishonest act, error or omission or intentional or knowing violation of law;

**b.** Coverage specifically provided in this coverage part for "fines and penalties" arising out of an "information security breach", if a limit for Fines and Penalties and Regulatory Defense coverage is shown on the Declarations; and

**c.** "Damages" arising out of any failure to provide access to "your" website or "your" "computer system" if such failure occurred because "you" suspended "your" website or "computer system" to mitigate "damages" arising out of a:

**(1)** Denial of service attack or distributed denial of service attack on "your" "computer system"; or

**(2)** "Malicious attack".

that prevented authorized users from accessing "your" "computer system".

However, we will defend "you" against allegations of any of the foregoing conduct referenced in paragraphs **6.a.**, **b**. and **c**. above until there is a final non-appealable judgment or adjudication, adverse admission or finding of fact against "you" as to such conduct at which time "you" shall reimburse us for "claim expense".

**7. Nuclear Energy**

Any liability or expense arising out of "Nuclear Energy Hazards".

**8. Pollution**

Any liability or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or with respect to any loss, cost or expense arising out of any:

**a.** Request, demand, order or statutory or regulatory requirement that "you" or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**b.** "Claim" or "suit" by or on behalf of a governmental authority for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

**9. War and Military Action**

Any liability or expense arising out of "war" or military action.

**B. EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE**, **A. TECHNOLOGY LIABILITY COVERAGE ONLY**

This insurance does not apply to:

**1. Asbestos**

Any liability or expense arising out of any actual or alleged:

**a.** Inhaling, ingesting or prolonged physical exposure by any person to asbestos or asbestos fibers or goods or products containing asbestos;

**b.** Use of asbestos in constructing or manufacturing any good, product or structure;

**c.** Intentional or accidental removal including encapsulation, dispersal, sealing or disposal of asbestos or asbestos fibers from any good, product or structure;

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

    **d.**  Manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos;

    **e.**  Product manufactured, sold, handled or distributed by or on behalf of "you" which contains asbestos; or

    **f.**  Acts or omissions by "you" in connection with the general supervision of any job involving the removal, enclosure, encapsulation, dispersal, sealing, or disposal of asbestos, asbestos fibers or products containing asbestos.

General supervision includes the rendering of or failure to render any instructions, recommendations, warnings, or advice.

**2.**  **Cost Guarantees**

Any liability or expense arising out of cost or price representations, guarantees, overruns or estimates being exceeded.

**3.**  **Employment Related Practices**

Any liability or expense to:

    **a.**  A person arising out of any:

        **(1)**  Refusal to employ that person;

        **(2)**  Termination of that person's employment; or

        **(3)**  Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

    **b.**  The spouse, "domestic partner", child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraph **a.** above is directed.

This exclusion applies:

    **c.**  Whether the injury-causing event described in paragraph **a.** above occurs before employment, during employment or after employment of that person;

    **d.**  Whether "you" may be liable as an employer or in any other capacity; or

    **e.**  To any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury.

**4.**  **Government Demands or Proceedings**

Any liability or expense arising out of a "claim", demand or proceeding brought by a local, state, federal, or foreign government, agency or entity.

However, this exclusion does not apply to any "claim" brought by a local, state, federal, or foreign government agency or entity in its capacity as "your" client.

If a limit for Fines and Penalties and Regulatory Defense is shown on the Declarations, this exclusion does not apply to "fines and penalties" otherwise specifically covered under this policy.

**5.**  **Professional Services**

Any liability or expense arising out of the providing of or failing to provide professional services by "you" or on "your" behalf while acting or working as any of the following:

    **a.**  Accountant;

    **b.**  Architect or surveyor;

    **c.**  Civil or structural engineer;

    **d.**  Other licensed engineer, except while acting or working as an engineer on "your product" or "your work";

    **e.**  Insurance agent, broker, company, consultant, or representative;

    **f.**  Investment advisor, stockbroker, banker, financial advisor;

    **g.**  Lawyer; or

    **h.**  Real estate agent or broker.

**6.**  **Property Damage**

a. "Property damage"; or

b. Loss of use of tangible property that is not physically damaged arising out of sudden and accidental physical damage to "your product" or "your work" after it has been put to its intended use.

However, this exclusion will not apply to any loss, corruption or destruction of "data" or information whether or not the tangible property on which the "data" or information is kept is physically damaged or lost.

**7. Recall**

Any liability or expense to recall, withdraw, upgrade, dispose of, or remove, "your product" or "your work" or any product containing or incorporating "your product" or "your work", from the marketplace.

However, this exclusion does not apply to:

a. The cost to recall, upgrade, correct, complete, rework, repair, or replace "your product" or "your work" in whole or in part by another party if any of "you" did not have the opportunity to upgrade, correct, complete, rework, repair, or replace "your product" or "your work"; or

b. "Claims" by third parties for loss of use resulting from recall, withdrawal, disposal, or removal of "your product" or "your work" due to a "third party anomaly".

**8. Unfair or Deceptive Business Practices**

Any liability or expense arising out of false or deceptive advertising, misrepresentation in advertising, antitrust, unfair competition, restraint of trade, unfair or deceptive business or trade practices, or any violation of securities, corporate governance or consumer protection laws, Racketeer Influenced and Corrupt Organizations Act (RICO), or any similar local, state, federal or foreign law or regulation. However, this exclusion does not apply to a "claim" that is otherwise covered under **SECTION I – COVERAGE**, **A. TECHNOLOGY LIABILITY COVERAGE**, **2. CYBER AND PRIVACY SECURITY LIABILITY**.

If a limit for Fines and Penalties and Regulatory Defense is shown on the Declarations, this exclusion does not apply to "fines and penalties" otherwise specifically covered under this policy.

**9. Violation of Law**

Any liability or expense directly or indirectly arising out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment or addition to such law;

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

c. The Fair Credit Reporting Act (FCRA) and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA);

d. Any similar federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information, except to the extent coverage for an "information security breach" is specifically provided by this policy; or

e. Securities, antitrust, or restraint of trade laws.

However, this exclusion does not apply to a "claim" that is otherwise covered under **SECTION I – COVERAGE**, **A. TECHNOLOGY LIABILITY COVERAGE**, **2. CYBER AND PRIVACY SECURITY LIABILITY**.

**10. Workers Compensation and Similar Laws**

Any obligation "you" have under any workers compensation act, employers liability law, unemployment compensation law, disability benefit law, or any similar local, state, federal or foreign law or regulation.

**C. EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE**, **B. FIRST PARTY CYBER COVERAGE ONLY**

This insurance does not apply to:

**1. Contractual Liability**

Any loss, cost or expense incurred by reason of assumption of liability in a contract or agreement,

**2. Governmental Authority**

Seizure or destruction of property by order of governmental authority. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. This

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

exclusion applies whether the "first party incident" results in widespread damage or affects a substantial area.

**3. "Data" Recapture**

Any loss, cost or expense for the recapture or recreation of lost, stolen or destroyed "data".

**4. Non-monetary Relief**

Any loss, cost or expense for compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief.

**D. EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE, B. FIRST PARTY CYBER COVERAGE, 2. DATA AND SYSTEMS RESTORATION, 4. BUSINESS INCOME LOSS AND EXTRA EXPENSE, AND 5. CONTINGENT BUSINESS INCOME LOSS AND EXTRA EXPENSE ONLY**

This insurance does not apply to:

**1. Act of Nature**

Any loss, cost or expense arising out of fire, smoke, an explosion, lightening, wind, flood, earthquake, volcanic eruption, tidal wave, landslide, or other act of God.

**E. EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE, B. FIRST PARTY CYBER COVERAGE, 6. FUNDS TRANSFER FRAUD AND 7. COMPUTER FRAUD ONLY**

This insurance does not apply to:

**1. Automated Clearing House, Service Bureau Or Electronic Communications System**

Any loss, cost or expense arising out of the acts or omissions of an "employee" or director of an automated clearing house (including a Federal Reserve Bank), service bureau, electronic communications system or similar interbank payment or settlement systems (including Fedwire, CHIPS and SWIFT) or merchants who have contracted with "you" to perform electronic funds transfer services.

**2. Potential Income, Interest or Dividends**

Any loss, cost or expense arising out of potential income, including interest and dividends, not realized by "you" or "your" customer.

**3. Social Engineering**

Any loss, cost or expense related to a "social engineering event".

## SECTION III – SUPPLEMENTARY PAYMENTS

1.  With respect to any "claim" we investigate, defend or settle, we will pay:

    **a.** All reasonable costs incurred by "you" at our request to assist us in the investigation or defense of a "claim", including actual loss of earnings up to $1000 a day because of time off from work;

    **b.** Prejudgment interest awarded against "you" on the part of a judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay prejudgment interest for the period of time after that offer;

    **c.** All interest on the full amount of any judgment that accrues after entry of a judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance;

    **d.** The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds; and

    **e.** All court costs taxed against "you" in a "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against "you".

    These payments will not reduce the Limits of Insurance.

    Our duty to make Supplementary Payments ends when we have used up the applicable Limit of Insurance in the payment of "damages" and "claim expense".

2.  **Pre-Claim Expense**

    We may, at our sole discretion, pay all "claim expense" we incur in investigating a potential "claim" "you" report in accordance with **SECTION V – CONDITIONS**, **11. Duties in the Event of Notice of Potential "Claim"**. Such payments will not apply toward the Limits of Insurance and Retention unless and until the "claim" is made in accordance with **SECTION V – CONDITIONS**, **9. Duties in the Event of a "Claim"**, at which time all "claim expense" incurred prior to the notice of "claim" becomes subject to the Limits of Insurance and Retention.

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**SECTION IV – LIMITS OF INSURANCE AND RETENTIONS**

1. **Limit of Insurance – Aggregate Limit Options**

   The "First Named Insured" must select an Aggregate Limit Option: either the Technology Liability and First Party Cyber Coverages **Shared Aggregate Limit Option** or the Technology Liability and First Party Cyber Coverages **Separate Aggregate Limits Option**. The Aggregate Limit Option selected by the "First Named Insured" will be shown on the Declarations and will be the only option to apply to coverage under this policy. The Aggregate Limit Options are described more fully below.

   a. **Technology Liability and First Party Cyber Coverage Shared Aggregate Limit Option**

      The Policy Aggregate Limit shown on the Declarations in Item **3.** is the most we will pay for the sum of all "damages", "claim expense" and "first party cyber loss" under **SECTION I – COVERAGE** for Technology Liability Coverage and First Party Cyber Coverage including Fines and Penalties and Regulatory Defense, if applicable, covered under this policy.

      Each payment we make for such "damages", "claim expense" or "first party cyber loss" reduces the amount of insurance available under the Policy Aggregate Limit by the amount of such payment. When this Policy Aggregate Limit is exhausted, we shall have no further obligation to defend "claims" seeking such "damages" or to pay "damages", "claim expense" or "first party cyber loss".

   b. **Technology Liability and First Party Cyber Coverages Separate Aggregate Limits Option**

      (1) The **TECHNOLOGY LIABILITY COVERAGE AGGREGATE LIMIT** shown on the Declarations in Item **3.** for all Technology Liability Coverages purchased is the most we will pay for the sum of all "damages" and "claim expense" for Technology Liability Coverages including Fines and Penalties and Regulatory Defense, if applicable, covered under this policy.

         Each payment we make for such "damages" or "claim expense" reduces the  amount  of  insurance available under the Technology Liability Coverage Aggregate Limit by the amount of such payment. When the Technology Liability Coverage Aggregate Limit is exhausted, we shall have no further obligation to defend "claims" seeking such "damages" or to pay such "damages" or "claim expense".

      (2) The **FIRST PARTY CYBER COVERAGE AGGREGATE LIMIT** shown on the Declarations in Item **8.** is the most we will pay for the sum of all "first party cyber loss" for First Party Cyber Coverages covered under this policy.

         Each payment we make for "first party cyber loss" reduces the amount of insurance available under the First Party Cyber Coverage Aggregate Limit by the amount of such payment. When this First Party Cyber Coverage Aggregate Limit is exhausted, we shall have no further obligation to pay "first party cyber loss".

2. **Technology Liability Coverage Each "Claim" Limit of Insurance**

   Subject to paragraph **1. Limit of Insurance – Aggregate Limit Options** above, if an Each "Claim" Limit of Insurance is shown on the Declarations in Item **5.** for a specific Technology Liability Coverage, then such Each "Claim" Limit of Insurance is the most we will pay for the sum of all "damages" and "claim expense" because of a "claim" directly resulting from a single "third party anomaly" or a series of "related third party anomalies" for the selected Technology Liability Coverage, regardless of the number of persons or entities insured, the number of "claims" made or the number of persons or entities making "claims" during the "policy period" or during any applicable Extended Reporting Period.

   Each payment we make for such "damages" or "claim expense" reduces the  amount  of  insurance  available under the Each "Claim" Limit of Insurance for the selected coverage by the amount of such payment. When the applicable Each "Claim" Limit of Insurance is exhausted, we shall have no further obligation to defend "claims" seeking such "damages" or to pay such "damages" or "claim expense" because of a "claim" directly resulting from a single "third party anomaly" or a series of "related third party anomalies".

3. **First Party Cyber Coverage Limit of Insurance**

   Subject to paragraph **1. Limit of Insurance – Aggregate Limit Options** above, if a Limit of Insurance is shown in Item **9.** on the Shared Aggregate Limit Declarations or Item **10.** on the Separate Aggregate Limit Declarations for a First Party Cyber Coverage, then such Limit of Insurance shown on the Declarations is the most we will pay for the sum of all applicable "first party cyber loss" for the selected First Party Cyber Coverage regardless of the number of persons or entities insured, the amount of "first party cyber losses" claimed or the number of "first party cyber incidents" during the "policy period".

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Each payment we make for "first party cyber loss" reduces the amount of insurance available under the Limit of Insurance for the selected First Party Cyber Coverage by the amount of such payment. When the applicable Limit of Insurance is exhausted, we shall have no further obligation to pay "first party cyber loss" for the selected coverage.

4. **Retentions**

   a. **Technology Liability Coverage "Each Claim" Retention**

   Subject to paragraph **1. Limit of Insurance – Aggregate Limit Options** above, for each Technology Liability Coverage shown with an Each "Claim" Limit on the Declarations in Item **5.**, we have no obligation to pay "damages" or "claim expense" until the Each "Claim" Retention shown on the Declarations in Item **6.** has been paid. The retention applies separately to each "claim".

   All "claims" directly resulting from a "third party anomaly" or any "related third party anomalies" shall be subject to the each "claim" retention shown on the Declarations.

   At our sole discretion, we may pay all or part of the each "claim" retention to settle a "claim", in which event the "First Named Insured" agrees to repay us promptly after notification of such retention payment.

   b. **Technology Liability Coverage – Reduction of Retention**

   If, prior to service of a "suit", or within 60 days after the filing of a "suit", "you" and we agree to non-binding arbitration by a neutral third party to resolve any "claim" reported to us, and if such "claim" is resolved through such non-binding arbitration, we will reduce the retention amount applicable to such "claim" by fifty percent (50%) or $10,000, whichever is less.

   c. **First Party Cyber Retention**

   Subject to paragraph **1. Limit of Insurance – Aggregate Limit Options** above, for each First Party Cyber Coverage shown with a Limit of Insurance in Item **9.** on the Shared Aggregate Limit Declarations or Item **10.** on the Separate Aggregate Limit Declarations, except for Business Income Loss and Extra Expense and Contingent Business Income Loss and Extra Expense, we have no obligation to pay "first party cyber loss" until the applicable First Party Cyber Coverage Retention shown in Item **10.** on the Shared Aggregate Limit Declarations or Item **11.** on the Separate Aggregate Limit Declarations has been paid. The retention applies separately to each "first party cyber loss".

   If a single "first party cyber loss", or a series of continuous, repeated or related "first party cyber losses", are subject to different retentions, the applicable retention(s) will be applied separately. However, the First Party Cyber Coverage Retentions applied to such "first party cyber loss" will not exceed the largest applicable retention.

   d. If a "first party incident" that causes "first party cyber loss" and a "third party anomaly" that results in "damages" or "claim expense" to which this insurance applies are related, we will apply each retention separately. However, the sum of all retention amounts applied to such "first party cyber loss", "damages", or "claim expense" will not exceed the largest applicable retention.

   e. The Limits of Insurance will not be reduced by payment of any "damages", "claim expense" or "first party cyber loss" within the applicable retention amount.

   f. Retention(s) shall be the responsibility of the "First Named Insured".

   g. All terms and conditions of this policy apply, irrespective of the retention.

5. **Fines and Penalties and Regulatory Defense**

   Subject to paragraph **1. Limit of Insurance – Aggregate Limit Options** above, if a Fines and Penalties and Regulatory Defense limit is shown on the Declarations in Item **5.**, such limit is the most we will pay for the sum of all "regulatory proceeding claim expense" incurred and "fines and penalties" regardless of the number of persons or entities insured, the number of "claims" made, or the number of government agencies or entities making "claims" during the "policy period" or any applicable extended reporting period.

   The Fines and Penalties and Regulatory Defense limit is part of, and not in addition to, the applicable Aggregate Limit shown on the Declarations and is subject to the Each "Claim" retention shown on the Declarations in Item **6.**

## SECTION V – CONDITIONS

1. **Allocation**

   If a "claim" includes both covered and uncovered matters, then coverage shall apply as follows:

   a. For "claim expense":

**(1)** One hundred percent (100%) of "claim expense" incurred by "you" on account of such "claim" shall be considered covered. However, the foregoing does not apply to:

    **(a)** "Regulatory proceeding claim expense" unless a limit is shown on the Declarations for Fines and Penalties and Regulatory Defense, then the amounts for covered "regulatory proceeding claim expense" and for uncovered fees, costs and expenses shall be allocated based upon the relative legal and financial exposures of, and the relative benefits obtained by, the parties to such matters; or

    **(b)** "Claim expense" if coverage is excluded under **SECTION II – EXCLUSIONS**, **EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE**, **A. TECHNOLOGY LIABILITY COVERAGE AND B. FIRST PARTY CYBER COVERAGE**, **6. Criminal, Fraudulent, Dishonest Act or Intentional Violation of Law**.

**b.** For "damages" other than "claim expense":

All remaining "damages" incurred by "you" from such "claim" shall be allocated between covered "damages" and uncovered "damages" based upon the relative legal and financial exposures of, and the relative benefits obtained by, the parties to such matters.

**2. Assignment**

"You" cannot assign or transfer "your" interest in this policy without our written consent.

**3. Bankruptcy**

Bankruptcy or insolvency of "you" or of "your" estate will not relieve us of our obligations under this policy.

**4. Cancellation and Nonrenewal**

**a.** The "First Named Insured" shown in the Declarations may cancel this policy for itself and all other individuals or entities included within the definition of "you" by mailing or delivering to us advance written notice of cancellation.

**b.** We may cancel this policy by mailing or delivering to the "First Named Insured" written notice of cancellation at least:

    **(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**c.** We will mail or deliver our notice to the "First Named Insured's" last mailing address known to us.

**d.** Notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.

**e.** If this policy is canceled, we will send the "First Named Insured" any premium refund due. If we cancel, the refund will be pro rata. If the "First Named Insured" cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**g.** We are not required to renew this policy. However, written notice of our intent to non-renew this policy shall be sent to the "First Named Insured" at least 60 days prior to expiration of the "policy period".

**5. Change in Ownership, Control or Exposure**

**a.** If during the "policy period":

    **(1)** Another person, entity or group of persons or entities acquires more than 50 percent of the assets of a "Named Insured";

    **(2)** Another person, entity, or group of persons or entities, acquires the right to select a majority of a "Named Insured's" directors or trustees; or

    **(3)** A "Named Insured" consolidates with or merges with another entity and the "Named Insured" is the surviving entity;

The "Named Insured" shall notify us as soon as practicable, but not later than 30 days after the effective date of the transaction. The "First Named Insured" shall provide any additional information we request.

**b.** If the described transaction in paragraph **a.** occurs and notification is timely provided, coverage under this policy for the "Named Insured" shall continue until the end of the "policy period", but only with respect to "claims" made for "damages" attributable to "third party anomalies" or "first party cyber losses" attributable to "first party incidents" which took place prior to the transaction, unless:

    **(1)** We agree in writing to provide coverage for "claims" or "first party cyber losses" made on or after the date of such transaction; and

    **(2)** The "First Named Insured" accepts any special terms, conditions, exclusions or additional premium charged by us.

**c.** If the "Named Insured" fails to provide notice as described in paragraph **4.a.** above, or fails to pay additional premium when due as described in paragraph **4.b.** above, coverage provided to the involved entity shall terminate as of the date of the transaction.

**d.** If, during or prior to the "policy period", any entity ceases to be a "subsidiary", then coverage will be available under the policy for such "subsidiary", but only for a "third party anomaly" or "first party incident" occurring before such transaction. No coverage will be available for any "third party anomalies" or "first party incidents" occurring after such transaction.

**6. Changes**

This policy contains all the agreements between the "First Named Insured" and us concerning the insurance afforded. The "First Named Insured" is authorized to make changes to the terms of this policy with our consent and such changes will apply to all entities that qualify as "you". This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**7. Conformance to Statute**

Any term of this policy which is in conflict with the statutes of the state in which this policy is issued is amended to conform to those statutes.

**8. Coverage Territory**

This policy applies to "third party anomalies" and "first party incidents" that occur anywhere in the universe with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

**9. Duties in the Event of a "Claim"**

If a "claim" is made:

**a.** "You" must see to it that we receive written notice of the "claim" as soon as practicable. To the extent possible, notice should include:

    **(1)** How, when and where the "third party anomaly" took place;

    **(2)** The names and addresses of any persons or entities allegedly sustaining injury or "damages" and any witnesses; and

    **(3)** The nature, amount and location of any injury, expense or "damages" directly resulting from the "third party anomaly".

**b.** "You" must:

    **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

    **(2)** Authorize us to obtain records and other information;

    **(3)** Cooperate with us in the investigation, defense or settlement of the "claim"; and

    **(4)** Assist us, upon our request, in the enforcement of any right against any person or entity which may be liable to "you" because of "damages" to which this insurance may apply.

**c.** "You" will not, except at "your" own cost, voluntarily make a payment, assume any obligation, or incur any expense related to a "claim" without our consent.

**10. Duties in the Event of a "First Party Incident"**

If a "first party incident" occurs:

**a.** "You" must see to it that we receive written notice of the "first party incident" as soon as practicable. To the extent possible, notice should include:

    **(1)** How, when and where the "first party incident" took place; and

    **(2)** The nature and amounts incurred by "you" that can be directly attributed to a "first party incident"; and

**b.** "You" must:

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(1)** Notify law enforcement authorities as soon as possible if "you" have reason to believe that any "first party incident" involves a violation of law;

**(2)** Submit to an examination under oath at our request and give us a signed statement of "your" answers; and

**(3)** Give us a detailed proof of loss statement within 120 days of the "first party incident".

However, if any fact or information regarding a "first party incident" is subject to a court order or law enforcement instruction, "you" must give to us written notice of the particulars of such "first party incident" as soon as practicable after such order or instruction is no longer in effect.

**11. Duties in the Event of Notice of Potential "Claim"**

If, during the "policy period", "you" become aware of any facts which could reasonably be expected to result in a "claim" directly resulting from a "third party anomaly" that occurred on or after the retroactive date but prior to the end of the "policy period", "you" may give written notice to us or any of our authorized agents with the full details.

Any subsequent "claim" made against "you" directly resulting from these facts will be deemed to have been made at the time the initial notice of potential "claim" was given to us. No subsequent policy issued by us will apply to such "claim".

Written notice of a potential "claim" by "you" or on "your" behalf to any of our authorized agents will be deemed to be notice to us.

For purposes of this condition, if written notice of a potential "claim" is received by us no later than 90 days after the end of the "policy period", then such potential claim will be deemed to have been received by us during the "policy period".

**12. International Insurance Requirements**

**a. Compulsory Insurance**

This policy is not a substitute for any compulsory local insurance in any country, jurisdiction, state or province whether or not this policy is accepted by local authorities. "You" must fully maintain any coverage required by law, regulation or other governmental authority during the "policy period". However, reduction of aggregate limits due to payments of "claims", judgments or settlements will not affect this requirement.

Failure to maintain such coverage required by law, regulation or other governmental authority will not invalidate this insurance. However, this insurance will apply as if the required coverage was in full effect.

The insurance provided by this policy is not admitted insurance in any country, jurisdiction, state, or province outside of the United States (including its territories and possessions). We are not responsible for any fines, taxes, or other penalties "you" may incur if "you" failed to obtain admitted insurance for "your" operations in any country, jurisdiction, state, or province. We will not provide any required bonds, certificates, or other evidence of insurance where this is not admitted insurance.

**b. Difference in Conditions**

This insurance applies on a difference in conditions basis when there is other insurance that:

**(1)** Is issued in a country or jurisdiction outside the United States (including its territories and possessions);

**(2)** Is intended to apply to "claims" made or brought in that other country or jurisdiction; and

**(3)** Provides coverage, in whole or in part, for the same "claim" covered by this insurance.

When this insurance applies on a difference in conditions basis, we will pay the difference between:

**(4)** The amount we would have paid under this insurance if no other insurance was available; and

**(5)** The amount "you" are entitled to under the terms and conditions of the other insurance "you" have for the same "claim", whether "you" can collect or not.

**c. Currency**

All premiums, limits, retentions, benefits, "damages", "claim expense", "first party cyber loss", Supplementary Payments and any other amounts are expressed and payable in the currency of the United States of America.

**(1**) All payments or reimbursements we make for damages because of judgments or settlements will be made in United States currency at the prevailing exchange rate as published in The Wall Street Journal at the time "you" became legally obligated to pay such sums.

 Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(2)** All payments or reimbursements we make for expense and Supplementary Payments will be made in United States currency at the prevailing exchange rate as published in The Wall Street Journal at the time the expense was incurred.

**(3)** All payments or reimbursements we make for loss of "digital currency" will be made in United States currency at the prevailing exchange rate as published in The Wall Street Journal at the time of loss.

If there is no applicable rate of exchange published in the Wall Street Journal, then payment under this Policy shall be made in the equivalent of United States of America dollars at the actual rate of exchange for such currency.

At our sole option, we may make any of these payments in a different currency.

**d. When We Are Prohibited From Defending "You"**

If we are prevented by law anywhere within the "coverage territory" from fulfilling our duty to defend any of "you" or investigate "claims", "you" will be responsible for providing that defense. We will reimburse "you" for all reasonable "claim expense" incurred which we would have paid if we had defended or investigated the "claim". Our duty to make such payments ends when we have used up the applicable Limit of Insurance in the payment of judgments or settlements subject to the applicable Limits of Insurance and retentions.

**e. When We Are Prohibited From Paying "Damages" on "Your" Behalf**

If we are prevented by law, anywhere in the "coverage territory", from paying "damages" to which this insurance applies, "you" may pay such "damages" with our written consent. Upon proof of such payments, we will reimburse "you" for such "damages", subject to the applicable Limit of Insurance.

**f. When We Are Prohibited From Paying Supplementary Payments**

If the laws or regulations of a country or jurisdiction within the "coverage territory" prohibit us from paying a Supplementary Payment on "your" behalf, we will reimburse "you" for such Supplementary Payment that "you" incur.

**g. Foreign Tax**

If we make payment in a jurisdiction outside of the United States (including its territories and possessions), Puerto Rico and Canada, all payments shall be made pre-tax without regard to tax consequences. We will not be liable for any differential or financial burden due to tax liability on the payment.

**13. Legal Action Against Us**

**a.** With respect to Technology Liability Coverage, no person or entity has a right under this policy:

**(1)** To join us as a party or otherwise bring us into a "suit" asking for "damages" from "you"; or

**(2)** To sue us on this policy unless there has been compliance with all of its terms.

A person or entity may sue us to recover on an agreed settlement or on a final judgment against "you", but we will not be liable for "damages" that are not payable under the terms of this policy or that are in excess of the applicable limits of insurance. An agreed settlement means a settlement and release of liability signed by "you" and the claimant or the claimant's legal representative and approved by us.

Any disputes between "you" and us as to whether there is coverage under this policy must be filed in the courts of the United States of America (including its territories and possessions), Puerto Rico or Canada.

**b.** With respect to First Party Cyber Coverage, no person or organization has a right under this policy to sue us for a "first party cyber loss":

**(1)** Unless all of its terms have been fully complied with;

**(2)** Until 90 days after "you" have filed proof of loss with us; and

**(3)** Unless such "suit" is brought within two years from the date the "described authorized person" discovers the "first party incident" that caused the "first party cyber loss".

**14. Liberalization**

If we adopt any revisions to the terms and conditions of this policy form to provide more coverage without additional cost during the policy term, the broadened coverage will immediately apply. However, the broadened terms and conditions will not apply to any "claims" that were first made against "you" or "first party incidents" that occurred prior to the effective date of the revision.

**15. Other Insurance**

**a. Technology Liability Coverage**

    Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

If "you" have other insurance which applies to a "claim" covered by this policy, this policy will be excess over any insurance, whether valid or collectible, including deductibles, retentions, whether the other insurance is primary, pro rata, contributory, excess, contingent or on any other basis. However, if the other insurance is written to apply as specific excess insurance over this policy's Limit of Insurance or the other insurance is an extended reporting period endorsement attached to another policy that we issued, this policy will be primary.

When this insurance is excess, we have no duty to investigate or defend any "claim" if any other insurer has a duty to defend "you" against that "claim". If no other insurer defends, we will undertake to do so, but we will be entitled to "your" rights against all those other insurers.

**b. First Party Cyber Coverage**

**(1)** If "you" have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this policy, we will pay only our share of the covered "first party cyber loss". Our share is the proportion that the applicable Limit of Insurance under this policy bears to the limits of insurance of all insurance covering on the same basis.

**(2)** If there is other insurance covering the same "first party cyber loss", other than that described in **(1)** above, we will pay only for the amount of "first party cyber loss" in excess of the amount due from that other insurance. We will not pay more than the applicable Limit of Insurance or applicable Aggregate Limit shown on the Declarations.

## 16. Representations

By accepting this policy, the "Named Insured" agrees that:

**a.** The statements in the Application and Declarations are accurate and complete;

**b.** Those statements are based on representations the "Named Insured" made to us; and

**c.** We have issued this policy in reliance upon these statements and representations.

The unintentional failure to disclose all hazards existing as of the inception date of the policy will not prejudice "your" rights under this policy. However, this provision does not affect our right to collect additional premium or exercise our rights of cancellation or nonrenewal in accordance with applicable insurance laws and regulations.

## 17. Right to "Claim" Information

**a.** If required by applicable law or regulation, we will provide the "First Named Insured" the following information relating to this and any preceding insurance we have issued during the previous three years:

**(1)** A list or other record of each "third party anomaly" not previously reported to any other insurer, of which we were notified in accordance with **SECTION V – CONDITIONS**, **9. Duties in the Event of a "Claim"**. We will include the date and brief description of the "third party anomaly" if that information was in the notice we received.

**(2)** A summary by policy year, of payments made and amounts reserved, stated separately under the applicable Aggregate for each annual policy year limit.

**b.** Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

**c.** "You" must not disclose this information to any claimant or claimant's representative without our consent.

**d.** If we cancel or elect not to renew this policy, we will provide such information no later than 30 days before the date of policy termination. In all other circumstances, we will provide this information only if we receive a written request from the "First Named Insured", in which case we will provide this information within 45 days of receipt of the request.

**e.** We compile "claim" and "third party anomaly" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the "First Named Insured" we make no representations or warranties.

Cancellation or nonrenewal will be effective even if we inadvertently fail to provide this information, or provide inaccurate or incomplete information.

## 18. Section Titles and use of Bold Type

The titling and bolding of sections and paragraphs within this policy is for convenience only and shall not be interpreted as a term or condition of this policy.

## 19. Separation of Insureds

Except with respect to the Limits of Insurance and Retention and any rights or duties specifically assigned in this policy to the "First Named Insured", this insurance applies:

**a.** As if each "Named Insured" were the only "Named Insured"; and

**b.** Separately to each of "you" against whom a "claim" is made.

**20. Sole Agent for "You"**

By accepting this policy, "you" agree that only the "First Named Insured" is authorized to act on behalf of all of "you" with respect to the following: payment of premiums, payment of Retention Amount, receiving return premiums, giving or receiving notice of cancellation or nonrenewal, requesting any Optional Extended Reporting Period and agreeing to any change to this policy.

Our communication on these matters will be with the "First Named Insured" and the inclusion of any of "you" on any such correspondence does not grant, alter or extend any rights or obligations under this policy.

**21. Subrogation**

**a.** In the event of payment under this policy, "you" must transfer to us any applicable rights to recover from another person or entity all or part of any such payment. "You" shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable us to effectively bring suit or otherwise pursue subrogation rights in "your" name.

**b.** If prior to the "third party anomaly" or "first party incident" connected with such payment, "you" have agreed in writing to waive "your" right of recovery or subrogation against any person or entity in accordance with **SECTION IV – CONDITIONS**, **23. Transfer Of Rights Of Recovery Against Others**, such agreement shall not be considered a violation of "your" duties under this policy.

**22. Two or More Policies, Coverage Parts, or Endorsements Issued by Us**

It is our stated intent that the various coverage parts, forms, endorsements or policies issued to the "Named Insured" by us, or any company affiliated with us, do not provide any duplication or overlap of coverage for the same "claim", "third party anomaly", "claim expense", "damages", "first party incident" or "first party cyber loss". If this coverage part, form, endorsement or policy and any other coverage part, form, endorsement or policy issued to the "Named Insured" by us, or any company affiliated with us, apply to the same "claim", "third party anomaly", "claim expense", "damages", "first party incident", or "first party cyber loss", the maximum Limit of Insurance under all such coverage parts, forms, endorsements or policies combined shall not exceed the highest applicable Limit of Insurance under any one coverage part, form, endorsement or policy.

This paragraph does not apply to umbrella insurance, or excess insurance, written by us or any company affiliated with us and issued to "you" specifically to apply in excess of the Limits of Insurance shown in the Declarations.

**23. Transfer Of Rights Of Recovery Against Others**

**a.** With respect to Technology Liability Coverage, we will waive our right to recover "damages" from another person or entity because of payments we make for "damages" directly resulting from a "third party anomaly", provided "you" have waived "your" rights to recover against such person or entity in a written contract or agreement executed before the "third party anomaly" is committed.

In all other circumstances, "you" agree to assign to us "your" rights of recovery against any other party for any "damages" or "claim expense" we have paid on "your" behalf. "You" will do everything necessary to preserve our rights and will do nothing to impair them. At our request, "you" will bring "suit" or transfer those rights to us and help us enforce them.

**b.** With respect to the First Party Cyber Coverage, if any person or organization to or for whom we make payment under this policy has rights to recover "first party cyber loss" from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after the loss to impair them. But "you" may waive "your" rights against another party in writing:

**(1)** Prior to a "first party incident"; or

**(2)** After a "first party incident" only if, at the time of the "first party incident", that party is one of the following:

    **(a)** Someone insured by this insurance;

    **(b)** A business firm:

        **1)** "You" owned or controlled; or

        **2)** That owns or controls "you"; or

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(3)** "Your" tenant.

This will not restrict "your" insurance.

## SECTION VI – DEFINITIONS

1. **"Bodily injury"** means bodily injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright or death resulting from "bodily injury", sickness or disease.

2. **"Breach notification laws"** means any federal, state, local or foreign privacy legislation or regulation that requires an entity to provide notice to affected natural persons or data protection authorities regarding any actual or potential unauthorized access to "personal information".

3. **"Business income loss"** means:

   **a.** Net profit or loss before income taxes that would have been earned or incurred if there had been no:

   **(1)** Denial of service or distributed denial of service attack on "your" "computer system"; or

   **(2)** "Malicious attack"; and

   **b.** Continuing normal operating expenses incurred, including payroll, if such expenses would have been incurred had such:

   **(1)** Denial of service attack or distributed denial of service attack on "your" "computer system"; or

   **(2)** "Malicious attack";

   not occurred.

   "Business income loss" does not include loss arising from:

   **(1)** Interest or investment income;

   **(2)** Contractual penalties;

   **(3)** Other consequential loss or damage;

   **(4)** Legal costs or expenses of any nature;

   **(5)** Liability to any person or organization that is not "you";

   **(6)** Cost or expenses to maintain, replace, update, remediate, recreate or improve "your" "computer system" to a level beyond that which existed prior to the applicable:

   **(a)** Denial of service or distributed denial of service attack on "your" "computer system", or

   **(b)** "Malicious attack"; or

   **(7)** Costs or expenses to identify or remediate "your" "computer system" errors or vulnerabilities.

4. **"Business income period of restoration"** means the period of time that:

   **a.** Begins with the date and time that the impairment of "your" business operations which is directly attributable to a:

   **(1)** Denial of service attack or distributed denial of service attack on "your" "computer system"; or

   **(2)** "Malicious attack";

   is first known by any "described authorized person" and after application of the business interruption "waiting period"; and

   **b.** Ends with the earlier of:

   **(1)** The date and time "your" "computer system" is restored to substantially the level of operation in existence prior to the:

   **(a)** Denial of service or distributed denial of service attack on "your" "computer system"; or

   **(b)** "Malicious attack"; or

   **(2)** 180 days from the date and time that "your" "computer system" was first interrupted by such:

   **(a)** Denial of service or distributed denial of service attack; or

   **(b)** "Malicious attack".

   The expiration date of this Policy or Coverage Part will not limit the "business income period of restoration".

5. **"Claim"** means:

   **a.** Any written demand for "damages";

**b.** A "suit";

**c.** A written request to toll or waive a Statute of Limitations; or

**d.** If Fines and Penalties and Regulatory Defense coverage is shown with a limit on the Declarations, "claim" also means a "regulatory proceeding".

With the exception of "regulatory proceeding" described in paragraph **d.** above, "claim" does not mean any criminal proceeding, regulatory or criminal administrative proceeding, or formal or informal criminal investigation.

"Claim" does not include a request by "you" for reimbursement of "first party cyber loss".

6. **"Claim expense"** means any reasonable and necessary legal fees and expenses, including but not limited to attorney fees, expert fees, cost of consultants and witnesses, and premium on appeal, attachment or similar bonds, incurred in the investigation, defense, settlement and appeal of a "claim".

"Claim expense" does not include salaries, wages, fees, overhead or benefit expenses incurred by us or by "you" except as specified in **SECTION III – SUPPLEMENTARY PAYMENTS**.

However, if a limit is shown on the Declarations for Fines and Penalties and Regulatory Defense, "claim expense" also means "regulatory proceeding claim expense".

7. **"Computer fraud"** means an intentional, unauthorized and fraudulent entry of data or computer instructions directly into, or change of "data" within, "your" "computer system" by a person or organization other than "you" or other person under "your" direct supervision, including any such entry or change made via the internet, provided that such entry or change causes:

**a.** "Money", "securities" or "other property" to be transferred, paid or delivered;

**b.** "Your" account or "your" customer's account to be added, deleted, debited or credited; or

**c.** An unauthorized or fictitious account to be debited or credited.

8. **"Computer fraud expense"** means "your" direct loss of "money", "securities", or "other property" directly caused by "computer fraud".

9. **"Computer system"** means any computer or computer network including hardware, software, telephone system, firmware, and the "data" stored thereon, as well as associated input and output devices, "data" storage devices, networking equipment and storage area network or other "data" backup facilities.

10. **"Confidential business information"** means any information related to trade secrets, processes, operations, style of work, identification of customers, or other information of commercial value which is owned, licensed, maintained or stored by "you" when disclosure is likely to cause harm to the business or there is a written requirement that the information be kept confidential.

11. **"Consumer redress funds"** means a sum of money which "you" are legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a "regulatory proceeding". "Consumer redress fund" shall not include any amounts paid which constitute taxes, fines, penalties, injunctive relief or sanctions.

12. **"Content"** means code, data, images, mask work, sounds, scents, tastes, text, textures or other forms of expression.

13. **"Contingent business income loss"** means, with respect to "your" business operations that are dependent on a "shared computer system":

**a.** Net profit or loss before income taxes that would have been earned or incurred if there had been no:

**(1)** Denial of service or distributed denial of service attack on a "shared computer system"; or

**(2)** "Malicious dependent attack", and

**b.** Continuing normal operating expenses incurred, including payroll, if such expenses would have been incurred by "you" had such:

**(1)** Denial of service or distributed denial of service attack on a "shared computer system"; or

**(2)** "Malicious dependent attack",

not occurred.

"Contingent business income loss" does not include loss arising from:

**(3)** Interest or investment income;

**(4)** Contractual penalties;

 Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(5)** Other consequential loss or damage;

**(6)** Legal costs or expenses of any nature;

**(7)** Liability to any person or organization that is not "you";

**(8)** Cost or expenses to maintain, replace, update, remediate, recreate or improve a "shared computer system" to a level beyond that which existed prior to the applicable:

  **(a)** Denial of service or distributed denial of service attack on a "shared computer system"; or

  **(b)** "Malicious dependent attack";

**(9)** Costs or expenses to identify or remediate "shared computer system" errors or vulnerabilities.

**14. "Contingent business income period of restoration"** means the period of time that:

**a.** Begins with the date and time that the impairment of "your" business operations which is directly attributable to a:

  **(1)** Denial of service or distributed denial of service attack on a "shared computer system"; or

  **(2)** "Malicious dependent attack"

is first known by any "described authorized person" and after application of the contingent business income "waiting period"; and

**b.** Ends with the earlier of:

  **(1)** The date and time "your" business operations are restored to substantially the level of operation in existence prior to the:

    **(a)** Denial of service or distributed denial of service attack on a "shared computer system"; or

    **(b)** "Malicious dependent attack"; or

  **(2)** 180 days from the date and time of such impairment of "your" business operations was first known by any "described authorized person".

The expiration date of this Policy or Coverage Part will not limit the "contingent business income period of restoration".

**15. "Cyber and privacy security anomaly"** means:

**a.** Failure to prevent unauthorized access to or unauthorized use, theft, loss, accidental release or publication of "confidential business information" or "personal information";

**b.** Failure to provide an authorized user access to "your" "computer system";

**c.** Failure to prevent tampering with code or an unintended transmission of a virus or harmful code,

**d.** Failure to comply with any provision in "your" "privacy policy" to protect "personal information" that is subject to any "privacy law" or "breach notification law"; or

**e.** Failure to provide notification of any actual or potential unauthorized access to or use of "personal information" as required by any "breach notification law" that applies to "you".

**16. "Cyber breach expense"** means reasonable and necessary fees, costs or expense:

**a.** To conduct an investigation and forensic analysis to assess the nature and extent of the "information security breach"; however, forensic analysis expenses do not include the cost of restoration, or correction of deficiencies, of "your" "computer system";

**b.** To retain outside legal counsel, approved by us, to provide and/or review recommendations as to how "you" should respond to an "information security breach" following the discovery and reporting of the "information security breach", including final legal review of the proposed breach notification letter(s); however, any legal expenses incurred by "you" do not include expenses for legal counsel to review any third party liability litigation or notification of potential litigation;

**c.** To notify the individuals whose "personal information" was subject to an "information security breach", including, but not limited to, the cost of mailing, printing, and other communications;

**d.** To establish a call center or a website to be made available to individuals whose "personal information" was subject to an "information security breach";

**e.** For credit or identity monitoring or identity theft education assistance for individuals whose "personal information" was subject to an "information security breach", for up to two years or as required by the applicable jurisdiction;

   **f.**  To retain a public relations firm to minimize harm directly resulting from a covered "information security breach" or violation of "breach notification laws"; and

   **g.**  For any other fees, costs or expenses pre-approved in writing by us at our sole discretion.

**17.** **"Cyber breach or extortion reward expenses"** means the amount paid by "you" with our prior written consent to an informant for information not otherwise available which leads to the arrest and conviction of a natural person or an entity responsible for an actual or threatened "information security breach" or a "cyber extortion threat" covered under this Policy.

However, we will not pay for information that was provided by:

   **a.**  "You";

   **b.**  "Your" internal or external auditors;

   **c.**  Any vendor or independent contractor hired by "you";

   **d.**  Any individual or firm hired by "you" to investigate the illegal act described above; or

   **e.**  Any individual(s) with supervisory or management responsibility of any of the individual(s) described above.

**18.** **"Cyber extortion expense"** means any reasonable and necessary expense incurred by "you" with our prior written approval including:

   **a.**  Any "cyber extortion payment" that has been made under duress by "you" or on "your" behalf, but solely to prevent or mitigate a "cyber extortion threat"; or

   **b.**  Other expenses directly relating to "your" efforts to prevent or mitigate a "cyber extortion threat".

**19.** **"Cyber extortion payment"** means "money", "other property", "your product" or "your work" demanded to mitigate or terminate a "cyber extortion threat".

**20.** **"Cyber extortion threat"** means a threat to:

   **a.**  Access, alter, corrupt, damage, misappropriate, destroy, delete, sell or disclose "confidential business information", "personal information" or software on "your" "computer system";

   **b.**  Initiate a denial of service attack on "your" "computer system"; or

   **c.**  Transmit a virus or harmful code into "your" "computer system";

   provided that such "cyber extortion threat" is made for the purpose of demanding a "cyber extortion payment".

**21.** **"Damages"** means a monetary judgment, award or settlement that "you" become legally obligated to pay. "Damages" also means punitive or exemplary "damages" or the multiplied portion of multiplied awards, if insurable under law. This paragraph shall be governed by the applicable law of the most favorable jurisdiction for such "damages":

   **a.**  Where the "claim" seeking such "damages" is brought or where such "damages" are awarded;

   **b.**  Where the "third party anomaly" giving rise to the "claim" occurred;

   **c.**  Where "you", subject to such "damages", are incorporated or have "your" principal place of business; or

   **d.**  Where we are incorporated or have our principal place of business.

However, "damages" does not include any:

   **e.**  Cost or expense to recall, upgrade, correct, complete, rework, repair, or replace "your product" or "your work" in whole or in part by:

      **(1)**  Any of "you"; or

      **(2)**  Another party if any of "you" had the opportunity to upgrade, correct, complete, rework, repair, or replace "your product" or "your work";

   **f.**  Costs to comply with an order for injunctive relief, or to comply with an agreement to provide such relief;

   **g.**  Credits, coupons, offsets, refunds or return of fees, rebates, charges, commissions or other compensation paid to "you";

   **h.**  Taxes;

   **i.**  Voluntary payments; or

 Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**j.**   Fines or penalties, except as provided above with respect to punitive, multiple portion of "damages". However, if a limit for Fines and Penalties and Regulatory Defense is shown on the Declarations, this paragraph does not apply to "fines and penalties" otherwise specifically covered under this policy.

**22. "Data"** means a representation of information, knowledge, facts, concepts or instructions which are being processed or have been processed in a "computer system".

**23. "Data and systems restoration expense"** means the reasonable and necessary expense for an outside professional firm to do any of the following in order to restore "your" "computer system" to the level of functionality it had immediately prior to the "malicious attack":

**a.**   Conduct an investigation and forensic analysis to assess the impact to "data" and "your" "'computer system";

**b.**   Replace or reinstall software or "data" from a written or electronic record;

**c.**   Remove any virus or harmful code; and

**d.**   Configure or correct the configuration of "your" "computer system".

However, "data and systems restoration expense" does not mean:

**e.**   Costs to replace hardware, research or correct deficiencies, or to increase the speed, capacity or utility of a "computer system" beyond what existed immediately prior to the "malicious attack";

**f.**   Labor costs of "your" "employees" or executives;

**g.**   Costs to research, recreate or develop any "data", including trade secrets; or

**h.**   The economic or market value of the "data", including trade secrets or any other consequential loss or damages.

**24. "Described authorized person"** means:

If the "Named Insured" is designated in the Declarations as:

**a.**   An individual, then the "Named Insured";

**b.**   A partnership, joint venture or limited liability company, any "Named Insured's" partner, manager or member; or

**c.**   An organization other than a partnership, joint venture or limited liability company, any "Named Insured's" director, executive officer or Chief Information Officer or any leader of the "Named Insured's" legal, finance, risk management or other department that is responsible for insurance matters, or the organizational or functional equivalent of such positions.

**25. "Digital currency"** means a digital or electronic medium of exchange this is used and accepted as a means of payment, but that is not issued by, or guaranteed by, a central bank, government or public authority.

**26. "Domestic partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by a "Named Insured".

**27. "Employee"** includes a past or current "leased worker", "temporary worker", and "volunteer worker". For purposes of this definition:

**a.**   "Leased worker" means a person leased to a "Named Insured" by a labor leasing firm under an agreement between the "Named Insured" and a labor leasing firm, to perform duties related to the conduct of the "Named Insured's" business;

**b.**   "Temporary worker" means a person who is furnished to a "Named Insured" to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions; and

**c.**   "Volunteer worker" means a person who is not a "Named Insured's" "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by the "Named Insured", and is not paid a fee, salary or other compensation by the "Named Insured" or anyone else for their work performed for the "Named Insured". "Volunteer worker" does not include a prisoner.

**28. "Errors and omissions anomaly"** means:

**a.**   Error, omission or negligent act;

**b.**   Breach of warranty or representation as to fitness, quality, suitability or performance; or

**c.**   Failure to perform the function or serve the purpose intended.

**29. "Extra expense"** means reasonable and necessary expense incurred by "you" during the "business income period of restoration" or "contingent business income period of restoration" in an attempt to continue business operations that have been interrupted but only to the extent such expense:

   **a.** Would not have been incurred if there had been no:

      **(1)** Denial of service or distributed denial of service attack on "your" "computer system" or a "shared computer system"; or

      **(2)** "Malicious attack", or "malicious dependent attack";

   **b.** Exceeds "your" normal operating expenses,

   **c.** Mitigates, reduces, or avoids "your" "business income loss" or "contingent business income loss"; and

   **d.** Is incurred with prior consent from us.

"Extra Expense" does not include:

   **e.** Contractual penalties,

   **f.** Costs or expense to prevent a loss or correct any deficiencies or problems with "your" "computer system or "shared computer system"; or

   **g.** Costs or expense to maintain, replace, update, remediate, recreate or improve "your" "computer system or a "shared computer system" to a level beyond that which existed prior to the applicable:

      **(1)** Denial of service or distributed denial of service attack on "your" "computer system" or a "shared computer system"; or

      **(2)** "Malicious attack" or "malicious dependent attack".

**30. "Fines and penalties"** means, to the extent allowable by law, monetary amounts imposed by any local, state, federal, or foreign government agencies or entities for any "claims" directly resulting from a "cyber and privacy security anomaly" or a series of related "cyber and privacy security anomalies" that results in an "information security breach".

**31. "First named insured"** means the "Named Insured" listed first in Item **2.** of the Declarations.

**32. "First party cyber loss"** means covered payments for "first party incidents".

**33. "First party incident"** means an event which triggers any of the coverages enumerated in **SECTION I – COVERAGES**, **B. FIRST PARTY CYBER COVERAGE**.

Any series of "first party incidents" that are connected by reason of a common action, circumstance, decision, fact, cause, result, damage, omission, policy or transaction shall be treated as a single "first party incident" that is deemed to have occurred on the date the first "first party incident" occurred. A "first party incident" will be deemed to have been first reported to us on the date we first receive a written notice of such "first party incident".

**34. "Funds transfer fraud"** means an intentional, unauthorized and fraudulent instruction transmitted by electronic means to a financial institution directing such institution to debit an account or to transfer, pay or deliver "money" or "securities" from such account, which instruction purports to have been transmitted by "you", but was in fact transmitted by a person other than "you" without "your" knowledge or consent.

**35. "Information security breach"** means actual or alleged unauthorized access to or unauthorized use, theft, loss, acquisition, or accidental release or publication of:

   **a.** "Confidential business information"; or

   **b.** "Personal information";

owned, licensed, maintained or stored by "you" or maintained or stored by a third party under written contract or written agreement with "you".

**36. "Malicious attack"** means:

   **a.** The introduction of a computer virus or harmful code into "your" "computer system"; or

   **b.** Damage to, destruction of, or deletion of "data" or software within "your" "computer system" by a person who:

      **(1)** Is not authorized to access "your" "computer system";  or

      **(2)** Is authorized to access "your" "computer system" but uses such access to cause damage, destruction or deletion.

**37. "Malicious dependent attack"** means:

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

    **a.** The introduction of a computer virus or harmful code into a "shared computer system"; or

    **b.** Damage to, destruction of, or deletion of "data" or software within a "shared computer system" by a person who:

        **(1)** Is not authorized to access a "shared computer system",  or

        **(2)** Is authorized to access a "shared computer system" but uses such access to cause damage, destruction or deletion.

**38. "Media and content anomaly"** means:

    **a.** Infringement or dilution of title, slogan, trademark, trade name, trade dress, service mark, service name, or copyright;

    **b.** Misappropriation of ideas under implied contract;

    **c.** Plagiarism;

    **d.** Piracy, but only when it directly relates to infringement of copyright or trademark; or

    **e.** Misuse of an intellectual property right in "content", but only when it results in "media and content liability anomalies" described in **38.a)** through **d)** above.

**39. "Money"** means:

    **a.** Currency, coins and bank notes in current use and having a face value;

    **b.** "Digital currency"; and

    **c.** Travelers checks, registered checks and money orders held for sale to the public.

    However, "money" does not include "securities".

**40. "Named Insured"** means any person or entity designated as such on the Declarations and any "subsidiary" of a "Named Insured".

**41. "Nuclear energy hazards"** means:

    **a.** Any injury or "damages":

        **(1)** With respect to which an insured under this policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        **(2)** Resulting from the hazardous properties of nuclear material and with respect to which:

            **(a)** Any person or entity is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

            **(b)** "You" are or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or entity.

    **b.** Any injury or "damages" resulting from hazardous properties of nuclear material, if:

        **(1)** The nuclear material:

            **(a)** Is at any nuclear facility owned by, or operated by or on behalf of "you" or

            **(b)** Has been discharged or dispersed there from;

        **(2)** The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of "you"; or

        **(3)** The injury or "damages" arises out of the furnishing by "you" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this paragraph **3)** applies only to property damage to such nuclear facility and any property thereat.

    As used in this definition:

    Hazardous properties include radioactive, toxic, or explosive properties;

    Nuclear material means source material, special nuclear material or by-product material;

    Source material, special nuclear material, and by-product material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

Spent fuel means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

Waste means any waste material (a) containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (b) resulting from the operation by any person or entity of any nuclear facility included under the first two paragraphs of the definition of nuclear facility.

Nuclear facility means:

**(4)** Any nuclear reactor,

**(5)** Any equipment or device designed or used for:

    **(a)** Separating the isotopes of uranium or plutonium;

    **(b)** Processing or utilizing spent fuel; or

    **(c)** Handling, processing or packaging waste;

**(6)** Any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of "you" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(7)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

Nuclear reactor means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

Injury or "damages" include all forms of radioactive contamination of property.

42. **"Other property"** means any tangible property other than "money" and "securities" that has intrinsic value.

43. **"Personal information"** means information that constitutes a natural person's non-public information as defined in any "privacy law", including information related to employment by "you". However, "personal information" does not include information that is lawfully available to the general public and not protected by any applicable "privacy law".

44. **"Personal injury anomaly"** means:

    **a.** Invasion, intrusion or interference with the right of privacy or publicity, including false light, or commercial appropriation of name or likeness;

    **b.** Wrongful entry, eavesdropping, eviction, trespass or other invasion of the right of private occupancy;

    **c.** Defamation, libel, slander, product disparagement, trade libel, mental anguish, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or entity; or

    **d.** False arrest, detention, imprisonment, or malicious prosecution.

45. **"Policy period"** means the period from the effective date of the current policy to the "policy termination date".

46. **"Policy termination date"** means the expiration date of the policy or any applicable cancellation date of the policy.

47. **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

48. **"Privacy law"** means any local, state, federal, or foreign privacy protection laws, statutes, or regulations that require "you" to protect the security or confidentiality of "personal information", to adopt or post specific privacy or security controls, or to notify to individuals or a governmental agency or entity in the event that "personal information" has been or potentially has been compromised. However, "privacy law" does not include those portions of any local, state, federal, or foreign privacy protection laws, statutes, or regulations that require "you" to provide access to "personal information", delete "personal information", or to correct incomplete or inaccurate "personal information" after a request is made by an individual.

49. **"Privacy policy"** means any publicly available written document that sets forth "your" policies, standards, or procedures for the collection, use and disclosure of "personal information".

50. **"Property damage"** means physical damage to tangible property of others, including all resulting loss of use of that property. Tangible property does not include "data".

51. **"Public relations service expense"** means the reasonable costs and expense incurred by "you" to:

    **a.** Retain a public relations consultant or firm, or a crisis management consultant or firm; and

    **b.** Plan or execute "your" public relations campaign;

To mitigate any actual or potential negative publicity generated from loss to which this insurance applies.

"Public relations service expense" does not include fees, costs or expenses "you" incur to comply with any law or regulation.

52. **"Regulatory proceeding"** means a civil investigation, proceeding or formal request brought by or on behalf of a local, state, federal or foreign government agency or regulatory authority seeking:

    **a.** Information;

    **b.** "Fines and penalties"; or

    **c.** "Consumer redress funds"

as a result of an "information security breach" directly resulting from a "cyber and privacy security anomaly".

53. **"Regulatory proceeding claim expense"** means "claim expense" incurred in a "regulatory proceeding" directly resulting from a "cyber and privacy security anomaly" or a series of related "cyber and privacy security anomalies" resulting in an "information security breach", if:

    **a.** This alleged violation of law occurred on or after the applicable retroactive date(s) and before the end of the "policy period";

    **b.** The "regulatory proceeding" is first filed against "you" during the "policy period" or any extended reporting period we provide and is reported to us as set forth in **SECTION V – CONDITIONS**, **9. Duties in the Event of a "Claim"**.

    **c.** "You" did not give notice of such "regulatory proceeding" or alleged violation of law on which it is based to any prior insurer, or notice under any policy of which this policy was a renewal, replacement or succeeds in time; and

    **d.** Prior to the inception date of the first **Technology Professional and Cyber Advantage** policy issued and continually renewed by us, no "described authorized person" knew:

        **(1)** The alleged violation of law on which the "regulatory proceeding" is based occurred;

        **(2)** The "regulatory proceeding" was filed; or

        **(3)** Any fact which could reasonably be expected to result in the "regulatory proceeding" or "claim" seeking injunctive relief.

54. **"Related third party anomaly"** means two or more "third party anomalies" that have as a common connection, tie, or link any fact, circumstance, situation, event, transaction, result, damage, cause, or series of related facts, circumstances, situations, events, transactions, results, damages or causes.

55. **"Securities"** means negotiable and nonnegotiable instruments or contracts representing "money" or "other property" and includes:

    **a.** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    **b.** Evidence of debt issued in connection with credit or charge cards, which cards are not issued by the "Named Insured".

However, "securities" does not include "money".

56. **"Shared computer system"** means a "computer system", other than "your" "computer system", operated for "your" benefit by a third party under written contract with "you", including "data" hosting, cloud services or computing, co-location, "data" back-up, "data" storage, "data" processing, platforms, software, and infrastructure-as-a-service.

57. **"Social engineering event"** means the fraudulent misrepresentation of a material fact by a third party pretending to be a client, vendor, "employee," or executive officer, which induces "you":

    **a.** To transfer "money" or send "securities"; or

    **b.** Instructs individuals or entities included within the definition of "you" to transfer such "money" or send "securities".

 Copyright 2019 The Hanover Insurance Company. All Rights Reserved. Includes copyrighted material of Insurance Services Office, Inc., with its permission.

58. **"Subsidiary"** means any corporation or limited liability company of which one or more "Named Insureds" owns more than 50% of the issued and outstanding voting stock, either directly or indirectly, on the inception date of the "policy period" and which was disclosed in the application or any other information or material submitted to us in applying for this policy.

59. **"Suit"** means:

A civil proceeding seeking "damages" because of a "third party anomaly" to which this insurance applies, or seeking injunctive relief related to a "third party anomaly". "Suit" includes:

**a.** An arbitration proceeding in which such "damages" are claimed and to which any of "you" must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which "you" submit with our consent.

60. **"Telecommunications fraud"** means the intentional, unauthorized, and fraudulent gaining of access to outgoing Voice over Internet Protocol and telephony services through the infiltration and manipulation of "your" "telecommunication services" by a person or organization other than "you".

61. **"Telecommunications fraud expense"** means amounts "you" must pay for charges that are directly attributable to the theft of "telecommunications services".

62. **"Telecommunications services"** means telephone, fax, data, or computer transmission services provided to "you" by others.

63. **"Third party anomaly"** means any of the following:

**a.** "Errors and omissions anomaly";

**b.** "Cyber and privacy security anomaly";

**c.** "Personal injury anomaly"; or

**d.** "Media and content anomaly".

64. **"Waiting period"** means the number consecutive hours, shown on the Declarations, that must elapse after the actual and measurable interruption or suspension of "your" business directly attributable to a:

**a.** Denial of service or distributed denial of service attack on "your" "computer system", or a "shared computer system"; or

**b.** "Malicious attack" or "malicious dependent attack".

A separate "waiting period" will apply to each "business income period of restoration" and "contingent business income period of restoration".

65. **"War"** means:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

66. **"You"** means, individually and collectively:

**a.** Any "Named Insured";

**b.** If the "Named Insured" is designated on the Declarations as:

**(1)** An individual:

**(a)** "Your" spouse or "domestic partner", but solely for liability directly resulting from any "third party anomaly" a "Named Insured" committed without the participation of such spouse or "domestic partner"; and

**(b)** The executor, administrator or legal representative of a "Named Insured" in the event of the "Named Insured's" death, incapacity or bankruptcy, but only while performing their duties as such executor, administrator or legal representative and only to the extent that the "Named Insured" would have been covered;

**(2)** A partnership or joint venture, "your" members, partners, and their spouses, but only with respect to the conduct of the "Named Insured's" business;

Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(3)** A limited liability company, "your" members, but only with respect to the conduct of the "Named Insured's" business or "your" managers, but only with respect to their duties as the "Named Insured's" managers;

**(4)** An organization other than a partnership, joint venture or limited liability company, "your" officers and directors, but only with respect to their duties as "your" officers or directors or "your" stockholders, but only with respect to their liability as "your" stockholders; or

**(5)** A trust, "your" trustees, but only with respect to their duties as trustees;

**c.** A "Named Insured's" "employees", but only for acts within the scope of their employment or while performing duties related to the conduct of a "Named Insured's" business;

**d.** Any entity a "Named Insured" newly acquires or forms, other than a joint venture or partnership, over which the "Named Insured" maintains ownership or majority interest, will qualify as a "Named Insured" if there is no other similar insurance available to that entity.

Coverage under this provision is afforded only until the 180th day after acquisition or formation, or the end of the "policy period", whichever comes first. Coverage does not apply to any "third party anomaly" committed before the "Named Insured" acquired or formed the entity; and

**e.** An individual who is an agent or independent contractor, but only:

**(1)** While acting within the scope of his or her written contract with the "Named Insured"; and

**(2)** If the "third party anomaly" to which this insurance applies occurs subsequent to the execution of the written contract;

**f.** Any client or other entity with whom a "Named Insured" agreed in a written contract to provide insurance provided that:

**(1)** The "third party anomaly" to which this insurance applies occurs subsequent to the execution of the written contract;

**(2)** The "claim" against the client or other entity directly results from a "third party anomaly" to which this insurance applies in "your product" or "your work"; and

**(3)** There is no allegation of independent misconduct on the part of the client or other entity.

However, with respect to the Insuring Agreements under **SECTION I – COVERAGE, B. FIRST PARTY CYBER COVERAGE**, "you" does not include those individuals or entities identified in paragraphs **e.** or **f.** above.

Subject to **SECTION IV – LIMITS OF INSURANCE AND RETENTIONS**, the most we will pay on behalf of the client, independent contractor or other entity is the lesser of the Limit of Insurance shown on the Declarations or the limit of insurance required under the contract.

**67. "Your product":**

**a.** Means:

**(1)** Any goods or products manufactured, sold, handled, distributed or disposed of by:

**(a)** A "Named Insured";

**(b)** Others trading under a "Named Insured's" name; or

**(c)** A person or entity whose business or assets a "Named Insured" has acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions in connection with "your product".

**68. "Your work":**

**a.** Means:

**(1)** Work or services performed by a "Named Insured" or on a "Named Insured's" behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or services.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions in connection with "your work".

**(3)** For the purpose of this definition, "your work" also means activities on the "Named Insured's" website.

## SECTION VII – EXTENDED REPORTING PERIODS

**A. TERMS APPLICABLE TO BOTH EXTENDED REPORTING PERIODS**

We will provide one or more Extended Reporting Periods, as described below, if:

**1.** This policy is canceled or not renewed; or

**2.** We renew or replace this policy with insurance that:

  **a.** Has a retroactive date later than the retroactive date shown on the Declarations of this policy; or

  **b.** Does not apply to "claims" directly resulting from a "third party anomaly" on a claims-made basis;

  and the "First Named Insured" does not obtain replacement coverage as of the effective date of such termination of coverage.

**3.** Extended Reporting Periods do not extend the "policy period" or change the scope of the coverage provided. They apply only to "claims" directly resulting from a "third party anomaly" occurring prior to the end of the "policy period", but not before the applicable retroactive date, if any, shown on the Declarations.

**4.** Once in effect, Extended Reporting Periods may not be canceled.

**5.** The Extended Reporting Period does not reinstate or increase the Limits of Insurance.

**B. AUTOMATIC EXTENDED REPORTING PERIOD**

**1.** If the "First Named Insured" cancels or does not renew this policy or we cancel or do not renew this policy for any reason other than nonpayment of premium, an Automatic Extended Reporting Period will be provided without an additional premium. This period starts with the end of the "policy period" and lasts for 90 days with respect to "claims" directly resulting from a "third party anomaly" occurring prior to the end of the "policy period" and not previously reported to us.

**2.** This Automatic Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance "you" purchase, or that would be covered but for exhaustion of the amount of insurance applicable to "claims".

**3.** The Automatic Extended Reporting Period does not reinstate or increase the Technology Professional and Cyber Advantage Policy Limits of Insurance.

**C. OPTIONAL EXTENDED REPORTING PERIOD**

**1.** If this policy is canceled or not renewed, the "First Named Insured" shall have the right, upon payment of an additional premium, to an Optional Extended Reporting Period. This period starts with the end of the "policy period" with respect to "claims" directly resulting from a "third party anomaly" occurring prior to the end of the "policy period" and not previously reported to us.

**2.** This Optional Extended Reporting Period does not apply to "claims" that would be covered but for exhaustion of the amount of insurance applicable to "claims". Any coverage provided by this Section shall be excess over any other subsequent insurance purchased by "you" covering "claims" to which this insurance applies.

**3.** The Optional Extended Reporting Period does not reinstate or increase the Limits of Insurance shown on the Declarations.

**4.** The "First Named Insured" must give us a written request for the Optional Extended Reporting Period endorsement within 90 days following the date of cancellation or nonrenewal. The Optional Extended Reporting Period will not go into effect unless the additional premium is paid promptly when due. If the cancellation or nonrenewal is for nonpayment of premium, this Optional Extended Reporting Period will not be provided unless any earned premium due is paid within 60 days after the effective date of such cancellation or expiration.

**5.** The available Optional Extended Reporting Periods and associated additional premiums are displayed in the table below.

| Optional Reporting Period | Percent of Annual Premium |
|---|---|
| One Year | 100% |
| Two Years | 150% |
| Unlimited | 200% |

6.   In the event similar insurance is in force covering claims first made during Extended Reporting Period, coverage provided by this insurance shall be excess over any part of any other valid and collectible insurance available to the insured, whether primary, excess, and contingent or on any other basis, whose policy period begins or continues after our "policy period" ends.

        Copyright 2019 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM – TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE

This endorsement modifies insurance provided under the following:

TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE COVERAGE PART

**A.** The following is added to **SECTION VI – DEFINITIONS**:

    **1.** **"Certified act of terrorism"** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism under the federal Terrorism Risk Insurance ACT, as amended (TRIA). The criteria contained in TRIA for a "certified act of terrorism" requires that the act must result in insured losses in   excess of $5,000,000 in the aggregate, attributable to all types of insurance subject to TRIA. The criteria also requires that the act must be a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The following is added to **SECTION IV – LIMITS OF INSURANCE AND RETENTIONS**:

**Cap on Losses from Certified Acts of Terrorism**

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100,000,000,000 in a calendar year (January 1 through December 31) and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100,000,000,000, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss, injury, "damages" or "first party cyber loss" that are otherwise excluded under this Policy, such as "damages", "claim expense" or "first party cyber loss" excluded by the War exclusion.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM – TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE

This endorsement modifies insurance provided under the following:

TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE COVERAGE PART

**A.** The following exclusion is added to **SECTION II – EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO SECTION I – COVERAGE, A. TECHNOLOGY LIABILITY COVERAGE AND B. FIRST PARTY CYBER COVERAGE**:

**Punitive Damages Related to a Certified Act of Terrorism**

"Damages" arising, directly or indirectly, out of a "certified act of terrorism" which are awarded as punitive damages.

**B.** The following is added to **SECTION VI – DEFINITIONS**:

**1. "Certified act of terrorism"** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" requires that the act must result in insured losses in excess of $5,000,000 in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act. The criteria also requires that the act must be a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The following is added to **SECTION V –CONDITIONS**:

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss, injury, "damages", "claim expense" or "first party cyber loss" that are otherwise excluded under this Policy, such as  "damages", "claim expense" or "first party cyber loss" excluded by the War exclusion.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# INDIANA CHANGES – TECHNOLOGY PROFESSIONAL AND CYBER ADVANTAGE

This endorsement modifies insurance provided under the following:

TECHNOLOGY AND PROFESSIONAL CYBER ADVANTAGE COVERAGE PART

**A.** The following is added to **SECTION II – EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO BOTH SECTION I – COVERAGE, A. TECHNOLOGY LIABILITY COVERAGE AND B. FIRST PARTY CYBER COVERAGE, 8. Pollution**:

This pollution exclusion applies whether or not such irritant or contaminant has any function in the "your" business, operations, premises, site or location.

**B.** The following is added to **SECTION V – CONDITIONS, 3. Bankruptcy**:

In case execution against "you" is returned unsatisfied in an action brought by a claimant or his or her personal representative because of an insolvency or bankruptcy, then an action in the nature of a writ of garnishment may be maintained by the claimant or his or her personal representative against us under and subject to the terms of this policy for the amount of the judgment not exceeding the amount of the policy.

**C.** The following is added to **SECTION V – CONDITIONS, 9. Duties in the Event of a "Claim"** and **10. Duties in the Event of a "First Party Incident"**:

References to notice in this section shall mean written notice given by "you" or on "your" behalf of to any of our authorized agents within the state, with particulars sufficient to identify the "Named Insured", shall be deemed to be notice to us.

**D.** **SECTION V – CONDITIONS, 4. Cancellation and Nonrenewal** is replaced by the following:

   **4. Cancellation and Nonrenewal**

   **a.** The "First Named Insured" shown in the Declarations may cancel this policy for itself and all other individuals or entities included within the definition of "you" by mailing or delivering to us advance written notice of cancellation.

   **b.** We will not cancel this policy except for failure to pay premium when due, or for fraud or material misrepresentation in procuring this policy or in relation to a claim. If the "First Named Insured" fails to pay premium when due, we will give 10 days' written notice to the "First Named Insured" before such cancellation is effective. In any of the other circumstances, we will give 20 days' written notice to the "First Named Insured" before such cancellation is effective.

   **c.** We will mail our notice to the "First Named Insured's" last mailing address known to us.

   **d.** Notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.

   **e.** If this policy is canceled, we will send the "First Named Insured" any premium refund due. If we cancel, the refund will be pro rata. If the "First Named Insured" cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   **f.** Proof of mailing will be sufficient proof of notice.

   **g.** We are not required to renew this policy. However, written notice of our intent to nonrenew this policy shall be sent to the "First Named Insured" at least 60 days prior to expiration of the "policy period".

**E.** The following is added to **SECTION V – CONDITIONS, 23. Transfer Of Rights Of Recovery Against Others**:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. Our right to recover damages or loss from another may be enforced even if the person or organization to or for whom we make payment has not been fully compensated for damages.

Copyright 2022 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**F.   SECTION VI – DEFINITIONS**, **47.** **"Pollutants"** is replaced by the following:

**47. "Pollutants"**

"Pollutants" include, but are not limited to: diesel, kerosene, and other fuel oils, gasoline, butane, propane, natural gas, and other fuels, brake fluid, transmission fluid, and other hydraulic fluids, ethylene glycol, methanol, ethanol, isopropyl alcohol, and propylene glycol, and other antifreeze additives, grease, tar, petroleum distillates, and other petroleum products, carbon monoxide, and other exhaust gases, stoddard solvent, mineral spirits, and other solvents, chromium compounds, emulsions/emulsifiers, naphtha, tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, methyl isobytyl ketone, methyl ethal ketone, n-butyl acetate, 2-butoxyethanol, hexylene glycol, peroxides, freon, polychlorinated biphenyl (PCB), CFC113, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides, barium, 1,2-Dichloroethylene, ethylene dichloride, dichloromethane, methylene chloride, ethylbenzene, lead, Mercury, Selenium, sulfate, xylene, silica, sewage, and other industrial waste materials and all substances specifically listed, identified, or described by one or more of the following references: Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions), Agency for Toxic Substances And Disease Registry ToxFAQs™, and/or U.S. Environmental Protection Agency EMCI Chemical References Complete Index. Substances identified as examples above or by the referenced lists include materials to be discarded, recycled, reconditioned or reclaimed.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

 Copyright 2022 The Hanover Insurance Company. All Rights Reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

**In Witness Whereof,** this company has caused this policy to be signed by its President and Secretary and countersigned on the declarations page, where required, by a duly authorized agent of the company.

John C. Roche
President

Charles Frederick Cronin
Secretary